CONRAD KRANZ *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*Municipal Corporation—Common Sewer—Dedication—Acceptance—Adoption—Liability of City for Damages arising from Failure to Repair, or Negligence in repairing a Common sewer passing under Private property—Notice—Charter of the City of Baltimore, sec. 835, of Art. 4, of the Code of Public Local Laws.*

The City of Baltimore has by its charter, Code of Public Local Laws, Art. 4, sec. 835, "full power to pave and keep in repair all necessary drains and sewers, to pass all regulations necessary for the preservation of the same, and to authorize any person by them appointed for that purpose, to enter upon the lots, grounds and possessions of any person or body politic, through which the *common sewers* run or ought to run, to regulate, make or repair the same." For more than twenty years the city used and controlled a stream within its limits as a common sewer, appointed an officer to see to its being kept in repair, and repaired it as well where it ran under private property as where it passed across or along public streets, without objection by owners of private property or interference on their part; and the stream had been made a complete and continuous arched, covered and under-ground drain or sewer, completely under the control and management of the city. HELD:

1st. That the legal results arising from this state of facts were, that the city had acquired the right thus to use the stream wherever it crossed or flowed along the streets, which were from time to time laid out over the land through which the stream ran, by virtue of its power to open and condemn streets, and by *adoption* wherever it passed through private property, and where the arching or covering of it may have been originally done by private owners.

2nd. That it must be presumed that such private owners had surrendered, devoted or dedicated their rights in the bed of the stream to the public for the purposes of a public sewer, and that the city and public had *accepted* such dedication or surrender, and that in consequence of its having thus become a public sewer the city was bound to keep it in repair, and was responsible for injuries resulting from negligence in making necessary repairs, as well as from the negligent or unskilful manner in which the work of repairing was actually done.

3rd. That the city under the clause of its charter above cited had undoubted power to acquire by dedication, adoption and acceptance, the right thus to use said stream where it flowed through or under private property.

4th. That in order to make the city liable in an action for damages occasioned by a defect in a public work of this character, the plaintiff must prove that the corporate authorities had notice of it, or knew of its existence, or show lapse of time or other state of circumstances from which notice could be implied.

Where a municipal corporation undertakes in the discharge of its duties to construct or repair such a work, it is responsible for damages caused by the negligent, careless or unskilful manner of performing the work.

APPEAL from the Baltimore City Court.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, RITCHIE, and BRYAN, J.

*Graham Gordon,* for the appellant.

*Bernard Carter, City Solicitor,* and *Robert Gilmor, City Counsellor,* for the appellee.

MILLER, J., delivered the opinion of the Court.

This suit was brought on the 9th of March, 1885, by the appellant against the appellee, to recover damages occasioned by the bursting of "Chatsworth Run Sewer."

The declaration contains three counts. The first alleges that the plaintiff is the owner of a house and lot on West Pratt street, where he carried on the tailoring business, and that this sewer commenced at the intersection of Pennsylvania Avenue and Townsend street, a considerable distance north of his property, and running southwesterly passed under his house and lot, and continued southwardly for a long distance to the intersection of Scott and Ostend streets; that it is a public or common sewer under the charge and care of the defendant, and it was the duty of the defendant to exercise reasonable care, skill, and diligence, in keeping the same in repair, and in repairing it when out of order; but that defendant well knowing that it was out of repair, recklessly and at various times, did not exercise reasonable care, skill, and diligence, in repairing the same and keeping it in proper order, and neglected so to do, whereby it did at various times, and particularly on the 11th and 31st of July, 1884, and in many places, and particularly near to the property of the plaintiff, become out of order and repair, and filled with earth, stone and sand, mud, filth, and other rubbish, and thereupon did burst and cave in near to the plaintiff's house, and his property was filled with large quantities of earth, sand, water, mud, filth, and other refuse matter; and his house and lot were made damp and unhealthful, and the plastering and papering on his house were destroyed, the walls of the house broken and undermined, a large quantity of his goods destroyed, his family and servants made sick, so that he lost their services as well as

his own, and his business was injured ; and he was compelled to spend large sums of money in curing himself and servants, and in repairing his house. The second count differs from the first, only in alleging that this was an under-ground drain or sewer, and that the defendant had by long and legal usage acquired the right to use it, and particularly that part thereof near to the plaintiff's property, to carry off large quantities of water, filth, and other drainage from the city. The third count alleges that the defendant had, for over twenty-one years, used this sewer or drain as a common sewer for the city, and that on and prior to the time when the damage sued for was done, it greatly needed cleaning and repairing, and that defendant by its servants and agents entered upon the work of cleaning and repairing it near to plaintiff's property, but in doing such work did not exercise reasonable care, skill, and diligence, and that the damages complained of resulted from the want of such care, skill, and diligence, in making such repairs.

The case was tried upon issue joined on the plea of *non cul.*, and after the plaintiff had closed his case, the Court, at the instance of the defendant, instructed the jury " that there is no sufficient legal evidence in the cause of such negligence on the part of the defendant in the discharge of its legal obligations to the plaintiff, as would entitle the plaintiff to recover in this action;" and counsel for the appellee seek to sustain this instruction upon two grounds:

1st. That there is no legal obligation upon the city to keep this sewer in repair where it passes under private property or elsewhere than under public streets.

2nd. That there is no legally sufficient evidence in the case that the bursting of the sewer under the plaintiff's house was caused by any neglect of the city in the repair of such parts of it as the city was bound to repair, or was caused by negligence in the repairs actually being made at the time of the bursting.

1st. The first proposition presents a question of some importance. It appears from the testimony that before the city had extended across and beyond it, what is now called Chatsworth Run Sewer, was an open running stream called in its lower part "Woodfork Branch," and in its upper part "Chatsworth Creek," the bed of which, was, of course "private property." The city had by its charter, "full power to pave and keep in repair all necessary drains and sewers, to pass all regulations necessary for the preservation of the same, and to authorize any person by them appointed for that purpose, to enter upon the lots, grounds and possessions of any person, or body politic through which the *common sewers* run, or ought to run, to regulate, *make* or repair the same." *Code, Public Local Laws, Art.* 4, *sec.* 835. Besides the oral testimony of the plaintiff's witnesses it was agreed that any ordinances of the Mayor and City Council relating to the subject should be read in this Court, and we have been referred to a large number of them extending back as far as the year 1829. It is not necessary to state these in detail. They show that as streets were laid out to accommodate the growth of the city in this direction, these streets when they crossed this stream were carried over it by arched culverts or bridges, and where the stream ran along and within the limits of a street, it was also arched or tunneled and the bed of it paved with stone. As the city was gradually built up along these streets, other ordinances and resolutions were passed providing for the like tunneling and paving of this stream, *between streets*, and in at least one case where it passed through private property, the resolution provides, that "the right to tunnel the same be secured without any expense for the right of way to the city." Others provide for the repairing of it in various places, and still others permit the construction of private drains from private houses to be connected with it. The testimony also shows that no such

private drain could be made without the permission of the city, but that any one could obtain such permission. The work thus done, even in the case of private tapping drains, was required to be done under the supervision of city officials. The aggregate amount appropriated by the ordinances and resolutions to which our attention has thus been called (and there may be others of like import) exceeds the sum of $70,000. The proof further shows that for a long period (much more than twenty years) the city has used and controlled this stream as a common sewer, from its source to a considerable distance below Pratt street, on which the plaintiff's property is located, has appointed an officer to see to its being kept in repair, has repaired it as well where it runs under private property, as where it passes across or along public streets, and that this user has continued to the present time without objection by the owners of private property, or interference on their part. In short, the plain inference from these ordinances and resolutions, and this proof, is that this stream in this part of it, at least, has for a long time been made a complete and continuous arched, covered and under-ground drain or sewer, and has come to be as completely under the control and management of the city as any other public sewer within its limits. In our opinion, the legal results arising from this state of facts, are, that the city has acquired the right thus to use this stream wherever it crosses or flows along the streets, which were from time to time laid out over the land through which the stream runs, by virtue of its power to open and condemn streets, and by *adoption* wherever it passes through private property, and where the arching or covering of it may have been originally done by private owners; that it must be presumed that such private owners have surrendered, devoted, or dedicated their rights in the bed of the stream to the public for the purposes of a public sewer, and that the city and public have *accepted* such dedica-

tion or surrender; and that in consequence of its having thus become a public sewer, the city is bound to keep it in repair, and is responsible for injuries resulting from negligence in making necessary repairs, as well as from the negligent or unskilful manner in which the work of repairing is actually done. As to the power of the city under the clause of its charter already cited to acquire by dedication, adoption and acceptance, the right thus to use this stream where it flowed through or under private property, we entertain no doubt whatever. This right of acquisition by adoption and dedication, and the consequent responsibility on the part of a municipal corporation, or the public is sustained by many well considered cases where the question has arisen under a similar state of facts. *Yates vs. Judd,* 18 *Wis.,* 118; *City of Indianapolis vs. Lawyer, et al.,* 38 *Ind.,* 348; *Houfe vs. Town of Fulton,* 34 *Wis.,* 608; *Emory vs. City of Lowell,* 104 *Mass.,* 13. The present case differs in all its essential features from that of *Munn vs. Mayor, &c. of Pittsburg,* 40 *Penn. State Rep.,* 364, relied on by counsel for the appellee. The proposition laid down in that case that where a city pours its sewers and drains into a natural running stream into which it had the right to pour them, is under no obligation to keep the stream clear to its mouth on the private property of all the landholders through which it flows, has no application here. The facts of this case as they are presented in this record do not justify the city in invoking that rule even if we should regard it as correct. In what we have thus said, we are not to be understood as holding that the city would be liable for damages caused by the insufficiency of the size or dimensions of this sewer as already constructed, to carry off the water and drainage flowing through it, or by over-flows in case of heavy rains. No such question is presented by this record.

2nd. The next point is, was there any evidence legally sufficient to authorize the jury to find that the damages

complained of were occasioned by the *negligence* of the city authorities in not repairing this sewer when it was out of repair, or in actually making the repairs referred to in the third count of the declaration? In considering this question we have recognized as true the two general propositions: 1st. That where a party sues for damages occasioned by a defect in a public work of this character, it is incumbent upon him, before he can recover, to prove that the corporate authorities had notice of it, or knew of its existence, or show lapse of time, or other state of circumstances from which notice can be implied. *Mayor vs. Sheffield*, 4 *Wallace*, 195. 2nd. That where a municipal corporation undertakes in the discharge of its duties, to construct or repair such a work, it is responsible for damages caused by the negligent, careless or unskilful manner of performing the work. 2 *Dillon on Municipal Corporations, sec.* 1049. What then is the testimony on this subject of negligence?

The plaintiff himself testified that he owned this property on the south side of Pratt street, and lived in the house; that when he bought it, this sewer passed across and under the beds of Baltimore, German, Lombard, King, and Pratt streets, and then under his house and lot, and that it unexpectedly burst on the 11th and 31st days of July, 1884; that on each occasion, as soon as it bursted, he used reasonable efforts to prevent injury to his property and effects, and on both occasions, water, mud, filth, slime, stone and plank, came into and on his property and injured it; that the city mended the sewer in both instances, and after the first breach, took out of his property about six cart loads of dirt, mud and stone.

The plaintiff's son testified that on the 11th of July, men were working in the sewer under the pavement of Pratt street, who were under the charge of Mr. Snyder, who was employed by the city to look after this sewer; that stones were hauled in one horse carts, and six horse

wagons, and thrown into the sewer through the inlet thereto, which was in front of plaintiff's house and lot; that witness had been in the sewer before and after the first break, and through it from Columbia avenue below, to King street above, the plaintiff's property, and that it was in bad condition both above and below the same; that under King street, the top of the sewer had bulged in so that he had to get on his knees to pass through it, and this bulging prevented the water from backing, if it got stopped up below; that the workmen had in the sewer under Pratt street, five, six or seven cart loads of stone and debris, and in some places had it piled up, and that some of it was old stone they had taken out to put in new ones; that they put in a dam under the pavement two feet high, and extending from one side of the sewer to a point two feet from the other; that they *left all this stone and debris in the sewer,* and he never saw them take any of it out; that this debris in the sewer helped it to burst, and if it had been kept in proper order, it would not have bursted; that the city mended the sewer both times it broke, and when the workmen mended it after the first break, they put only three layers of brick on the arch, but when they mended it the second time, they put on four layers of brick, and also placed large stones on the top of the sewer in the plaintiff's cellar; that when they mended the sewer the second time, the workmen were *more careful* about throwing in so much stone, and did not throw in so many at one time; that the sewer had never injured the plaintiff before the 11th of July, and the water always before that time had passed through it very well, and it was of good size under the plaintiff's house; that it was in bad condition under Pratt street, and witness went to the top of his gum boots in holes there.

Two of the workmen who had been engaged in this work of repair, testified to substantially the same state of facts. They say they had five or six cart loads of stone

and rubbish in the sewer when it bursted, and that this helped to bank up the water and burst the sewer. One of them says he had been through the sewer from Fayette street to the end of it, the other from King to Hamburg streets, and both testify that it was in bad condition above the plaintiff's house, that there was a great deal of mud and filth and many holes in it, and that under King street the top of the arch had settled nearly two feet for a space of more than fifty feet in length, and that this settling retarded the passage of the water up when it was collected below; that it was not mended strong enough when it broke the first time, and that it was mended stronger the second time; that the bottom of the sewer under Pratt street was made out of plank, and it would be better if it had been made of stone, as the water gets under planks and pulls them up. One of them says that Snyder came into the sewer twice while the work was going on, and that as a city officer, he went up and examined the place where it had sunk under King street.

Another witness testified that he, with several other persons, called upon the Mayor about two years ago, and complained of the condition and overflow of this sewer between German and Baltimore streets, and that the City Commissioner who was present, said the sewer ought to be repaired but there was no appropriation by the city, that he knew all about its condition, and the Mayor then said it would be reported to the City Council.

Such, in substance, is the testimony of the plaintiff's witnesses on this subject. There was no proof that there had been any fall of rain prior to either of these breakings, causing an unusual flow of water into the sewer, and subjecting it to unusual pressure; nor is there any thing to show that they could be attributed to any other causes than those to which these witnesses have testified. We are all of opinion that there is enough in this testimony to have warranted the jury in finding, at least, that

the work of repair was carelessly and negligently conducted, and that this, in connection with the bad condition of the sewer in other places, caused it to burst. This testimony, therefore, should not have been withdrawn from the consideration of the jury.

*Judgment reversed, and*
*new trial awarded.*

(Decided 29th January, 1886.)