## CHRISTIAN F. KURRLE *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*Bill of Exceptions Failing to Show the Evidence Rejected—*
*Action Against Municipal Corporation for Damage Caused*
*by Defective Construction of Sewer and the Flooding*
*of Plaintiff's Property—Evidence—Instructions—*
*View of Premises by the Jury.*

When an exception is taken to the refusal of the trial Court to admit in evidence the report of a municipal commission, offered to show a certain fact, the exception must state what the book contained on the subject, in order that this Court may determine whether or not the ruling of the lower Court was correct.

In an action against a municipality where the plaintiff alleges that the defendant's failure to construct a sewer on a certain street caused plaintiff's land to be flooded, evidence that a certain City Commissioner had recommended that a sewer be built in that street is not admissible. A municipality is not liable for failure to make the improvements recommended by its officers.

The evidence in this case is held to be legally sufficient to show that the defendant municipality constructed a sewer of insufficient size and construction to carry off all the water in seasons of ordinary rainfall, and in consequence of the faulty construction of the sewer in this and other respects the plaintiff's property had been flooded, and that consequently it was error to instruct the jury that there was no evidence to show that the sewer was unskillfully constructed, or that it had not been maintained so as to provide for all the water which might be reasonably expected to flow into it.

The failure of a municipal corporation to grade, pave and place gutters in a certain street does not render it liable to the owners of property in that street which was flooded by water made to flow into the street by the acts of private parties, who

changed the configuration of adjacent land not belonging to the municipality.

When the evidence in the case shows that plaintiff's property was flooded by water coming at a certain time from a defectively constructed sewer, and that it was also flooded at other times by water coming from other sources, a prayer is erroneous which instructs the jury that their verdict must be for the defendant, the municipal corporation which built the sewer, as it cannot be determined how much damage was caused by the water from the sewer and how much by the water from other sources.

The fact that the jury has viewed the premises in an action to recover damages for an injury to the land does not prevent the trial Court from deciding that there is no legally sufficient evidence to entitle the plaintiff to recover.

*Decided March 31st, 1910.*

Appeal from the Superior Court of Baltimore City (STOCKBRIDGE, J.).

*Defendant's 7th Prayer.*—That there is no evidence that Twenty-Second street, as testified to, both in front and in rear of the plaintiff's property is a public street, or that it was opened, graded, paved or curbed by the defendant, and that there is no evidence legally sufficient to show that the course in which surface water flowed prior to the opening, grading, paving and curbing of Twenty-Second street at the time the damages are alleged to have happened was deflected or diverted by any act of the Mayor and City Council of Baltimore, and that under the pleadings there is no liability on the City for any damage which the plaintiff may have sustained because of water flowing into his premises from Twenty-Second street in front or in the rear of his property. (*Granted.*)

*Defendant's 8th Prayer.*—That there is no evidence that the City has collected water in an artificial channel and thrown it on the property of the plaintiff and as far as any

damage sustained by the plaintiff because of water flowing into his property from Twenty-Second street in front and in rear of his property, there can be no recovery; and under the pleadings for any loss thus sustained by the plaintiff, their verdict must be for the defendant. (*Granted.*)

*Defendant's 9th Prayer.*—That there is no way of determining from the evidence how much damage was caused by the water which flowed into the premises of the plaintiff from the sewer, and how much from the lands in the rear of the plaintiff's house, during the overflow of 1905, or from Twenty-Second street in the rear of the plaintiff's house during the overflow of 1906, and under the pleadings their verdict must be for the defendant. (*Granted.*)

*Defendant 10th Prayer.*—That the fact that the plaintiff's property has been damaged does not entitle him to recover against the City, and before he can recover he must show that the defendant failed in some duty towards him and that the failure of that duty was the direct and proximate cause of the damages sustained; and the defendant prays the Court to instruct the jury that there is no evidence legally sufficient under the pleadings to show that the defendant failed in any duty towards the plaintiff which caused the damage complained of, and their verdict must be for the defendant. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Richard B. Tippett and William S. Bansemer,* for the appellant.

*Sylvan Hayes Lauchheimer* and *W. H. DeC. Wright,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellant sued the appellee to recover damages for injuries alleged to have been caused to his property for which

he claims it is responsible. The first count of the declaration alleges that the plaintiff was the owner and in possession of a certain business carried on in property in Baltimore City, which fronted on Jenkins lane, and ran back to a stream of water known as Jenkins run; that sometime before the happening of the injuries complained of the defendant constructed a sewer to carry off water which theretofore ran in Jenkins run, as well as that which might fall and run therein, which was so constructed as to connect with an existing sewer of the defendant; and that from the carelessness and want of ordinary care of the defendant it did not provide the Jenkins run sewer, and the one with which it connected, with sufficient size and capacity to carry off the waters of Jenkins run as well as the rain water which might be expected to flow therein and the waters which flow in the connecting sewer; that by the exercise of ordinary care and diligence the defendant had notice, or might have had notice, of the injuries which would necessarily be inflicted upon the plaintiff by reason of the insufficient capacity and size of the said sewer with which Jenkins run sewer connects; that by reason of the insufficient size of the sewer with which Jenkins run sewer connects, it fails to carry off the water which drains therein when it is burdened by rain water which flows therein in addition to the ordinary flow of water in it, and by reason of the insufficient capacity of said sewer it has frequently overflowed and the water backed up in the premises of the plaintiff, causing him serious loss and damage, etc.

The second count alleges that Jenkins lane, also called Taylor street, is a public highway owned by the defendant, and by reason of the failure of the defendant to use proper care and diligence in caring for said street, it has failed to grade and pave the same and to place gutters in it to carry off the waters which flow therein from rain and other sources, the defendant well knowing that and well knowing that recently other streets had been opened up connecting with Jenkins lane in such manner that large quantities of water flow from other streets in and over Jenkins lane, and it not

being provided with gutters and other means for taking off
said water, large quantities flow from other streets and from
Jenkins lane over and across the premises of the plaintiff, so
that his dwellings, buildings, machinery, etc., have been se-
riously damaged.

The general issue plea was filed and the trial resulted in a
verdict for the defendant. From the judgment entered there-
on this appeal was taken. There are three exceptions to rul-
ings on the evidence which we will consider before passing
on the prayers. The first is presented in this way: the City
Engineer was on the stand when he was asked to look at a
book handed him and to say whether it was one of the reports
of the Sewerage Commission. The defendant objected, and
the counsel for the plaintiff said it was only offered for the
purpose of showing notice, and that he had no desire to offer
it as a report in evidence. The Court took the pamphlet and
after some further remarks what took place is thus described
in the record: "Court: As far as that is concerned, that it
brought attention to the fact would bring it in evidence, but
not as to what in their estimation caused it. Mr. Tippett:
Of course, I understand that. Court: And so the fact may
be that a report was made upon the Jenkins run sewer, or
Harford run sewer, or any of the others, and that fact be
proved, but not what that report was. To which ruling of
the Court the plaintiff excepted," etc.

It will be observed that there was no distinct ruling on the
subject, but if it be treated as ruling the report out, it would
not be reversible error. In the first place, Mr. Tippett said:
"I have no desire to offer the report as a report in evidence.
It is solely on the question of notice." What it said we have
no means of knowing. If there was anything in it which was
admissible, it should have been offered, and set out in the
record, so we could determine its admissibility. This is not
like the case of *County Commissioners* v. *Gantt,* 78 Md. 286,
which overruled some previous cases, for there it could not
be told what the witness would say, as the question was not

allowed to be answered, but there could be no possible reason why we could not be informed as to precisely what was offered and what the book contained. The book was in Court; counsel said he only wanted to call attention to certain references in it, and he could have offered whatever parts he desired a ruling on, and if excluded and he wanted us to review the ruling, he should have had it in the record. Moreover, the City Engineer made all the admissions which were necessary to show that he had notice of complaints about this sewer. So it is useless to discuss the subject further.

Nor was there error in the ruling presented by the second exception. The witness had already said he had never read the report of the Sewerage Commission for 1906, although he admitted it was on file. The question was then asked: "It refers specifically to the work of your department? A. No; I would not say that. Q. I mean the work of your department as conducted by you prior to the Sewerage Commission having general charge of the sewers in Baltimore City?" The latter question was objected to and ruled out. We cannot see its relevancy, but, regardless of that, what we have said above is applicable to this exception. The page of the report referred to in the question, upon which the subsequent ones were dependent, is not in the record, and we have no information by which we could determine its application, if any, to this case.

In the third exception there was an offer to prove from a bound volume of the City Commissioner's Reports of Baltimore City for the year 1895, that Janon Fisher, who was the City Commissioner, recommended "that a sewer should be built by the City to drain the watershed now drained by Jenkins run sewer, from the end of the City sewer at the intersection of Federal street and Carter alley east through the bed of Federal street to Greenmount avenue; thence north in the bed of Greenmount avenue to a junction with Jenkins run sewer." That was clearly inadmissible. If the City is to be held liable for recommendations of improvements by

its different officers, it would be best not to have any recommendations on record.  Mr. Fisher doubtless gave what he believed to be good reasons for making such recommendation, but it certainly cannot follow that the City is liable because he is in his report so recommended.  Engineers differ, and differ widely, as to the necessity or desirability of improvements, and as to the method to be adopted, if made, as is illustrated by this record.

The fourth bill of exceptions contains the rulings on the prayers, those excepted to being the defendant's second, sixth, seventh, eighth, ninth and tenth.  The second and sixth may be considered together, the second instructing the jury that there was no legally sufficient evidence under the pleadings to show that the sewer mentioned in the evidence is of insufficient capacity to carry off the water which it was designed to drain, in times of ordinary rainfalls, and under the pleadings their verdict must be for the defendant, as far as the first count is concerned.  The sixth instructed the jury that there was no such evidence to show that the sewer was unskillfully constructed or that it has not been maintained so as to provide for all the water which might be reasonably expected to flow towards and into it.  That also refers to the first count.  It must be admitted that this sewer, as a whole, from where it begins to Jones' Falls, where it empties, is peculiarly constructed.  Mr. Fendall, the City Engineer, who was called as a witness for the plaintiff, said it has too many curves, was longer than necessary, that there are eight or ten sections to it, some of which are semi-circular arches of varying heights of walls; some are segmental arches with low walls, one is a segment without any wall, and other sections are complete circles.  That part he built is a circle of nine feet and six inches diameter, and was joined to a circle of ten feet six inches diameter.  But the most serious defect, if it be so regarded, is the fact that the capacity of the part of it on Carter alley is considerably smaller than the sections on either side of it.  All of the water that enters the sewer near

the plaintiff's property has to pass the Carter alley section, and hence the important question, under the first count in the declaration, was whether that is sufficient. A sewer may be of sufficient capacity at its beginning, but if it is too small at some point along the line to let the water which enters there run through, there is likely to be trouble—indeed, it is certain there will be if the flow into the head continues long enough to fill up the sewer. The part of the sewer which is smaller than the rest is from Girard avenue to the west side of Greenmount avenue, about eleven hundred feet. The area of that cross section is 49-1/100 square feet. while the area under Greenmount avenue is 175 square feet and the area for six hundred and eighty feet north of Greenmount avenue is 86-36/100 square feet. As constructed when the injuries complained of occurred, the City Engineer testified that "all the water that gets into this sewer under Greenmount avenue has to go through this small one, the Carter alley sewer, and then goes off into the larger sewer between Girard avenue and Jones' Falls." It is proper to say that Mr. Fendall testified that there were plans in his office showing a proposed extension down Girard avenue to Greenmount avenue, then up the latter to the structure under Greenmount avenue, above referred to, and if that had been built it would have relieved Carter alley sewer to the extent this proposed sewer would have taken the water off. In other words, there would be two lines of sewers between Greenmount avenue and the point at Girard avenue where the sewer is larger than it is under Carter alley, and doubtless some such proposed extension was the reason why there was such a large area under Greenmount avenue.

There is some evidence tending to show that the Carter alley sewer had been a source of trouble and anxiety on the part of the City officials for some years. We do not refer to it being out of repairs at times, as there is nothing to show that it was at the dates complained of in this case, but complaints had frequently been made to the authorities, and

plans were being considered to relieve it of some of the water
it had to carry. It cannot be presumed that the City authori-
ties would have made the sections above the Carter alley
sewer so much larger than it was, if that size was deemed suf-
ficient. If there was reason to make the sewer larger higher
up, there was certainly more reason to have the lower part
on Carter alley larger, for the evidence shows, and it might
be assumed, that there were inlets into this sewer along its
line, and that the part of the sewer towards the end where
it empties will generally be required to carry more water
than towards the beginning. Of course we understand that
the City authorities might make the upper sections of a
sewer larger than a lower section built some years before, so
as to provide for future conditions which were not then in
existence, but in this case there can be no doubt from the
evidence that Carter alley sewer was not regarded as satis-
factory for some years and the City authorities had ample
knowledge of that fact. In a former suit by the plaintiff
against the City, which was brought in 1903, and tried in
1904, there was evidence offered that the plaintiff's property
had been flooded from this sewer prior to the institution of
that suit. The testimony of witnesses in this record tends
to show that on June 22nd, 1905, and on July 22nd, 1906,
the plaintiff's property was very badly flooded. One of them
said that on July 22nd, 1906, he saw the water coming from
the mouth of the sewer into the cattle pens of the plaintiff;
that the water passed in there for half an hour or more. The
plaintiff testified that his property was never flooded until
the Fendall sewer was built; that Jenkins run was an open
stream when the sewer was extended in it beyond his place;
that about ten years before Greenmount avenue was flooded,
and three houses which were over the sewer at that point
went down; that he had seen that section flooded three or four
times; that three or four houses on Twenty-first street were
flooded before the Fendall sewer was built; that before the
Fendall sewer was put in he knew of houses near the mouth

of the sewer being flooded. He spoke of the flood of June, 1905, and the one in July, 1906, which he claims came from the overflow of Jenkins run sewer. The plaintiff's son testified as to the floods of 1905 and 1906; said he saw the water coming from the overflow of the sewer, although in 1905 there was more coming from the front part of the plaintiff's premises than there was in 1906. He spoke of the rain of June 22nd, 1905, as "an ordinary heavy rain and lasted an hour."

Mr. Varney, who was City Engineer from 1898 to 1900, was called by the plaintiff. He testified that in his judgment the water came into the plaintiff's premises from three sources—one down Twenty-second street, the other through a drain from the sewer, and the other from the mouth of the Fendall sewer. He spoke of the incapacity of the Carter alley sewer, and also that the Fendall sewer was not properly constructed; that it ought to have had wing-walls and ought not to have been built so high up. He was allowed without objection to give his opinion as to the cause of the overflow of the sewer and the flooding of the plaintiff's property, based on the testimony of the witnesses, and we cannot say that there is no evidence as to the incapacity of the Carter alley sewer and as to the faulty construction of the Fendall sewer with that and other testimony before us. It may be true that in some respects his testimony is not altogether satisfactory— for example, when he assumed that the rain fall was four inches; but, taking it as a whole, we are not prepared to say there was not enough in it and the other evidence to make out a *prima facie* case of negligence in the construction of the sewer which resulted in the plaintiff's injury. It may be that the City can make such explanation as would meet the *prima facie* case, but as the record stands there was sufficient to go to the jury. There is no evidence of the overflows spoken of being the result of such extraordinary rains as to bring them within well-established rules which relieve the municipal corporation from liability. The fact that the plaintiff's prop-

erty was never flooded until the Fendall sewer was built is a circumstance to be considered, although of course not conclusive. Then the peculiar construction of the sewer from the mouth to Carter alley, inclusive, is another circumstance that at least requires some explanation on the part of the defendant. The further fact that the City had contemplated relieving Carter alley sewer by another from Girard avenue to Greenmount avenue means something, and such evidence, together with that of the witnesses who saw the floods and that of Mr. Varney, required in our judgment the case to be submitted to the jury on the first count. Mr. Varney, who was familiar with the vicinity and whose duties as City Engineer required him to give attention to such matters, said: "We have had a rain fall of four inches, about once in one or two years, in that vicinity, running back the last twelve or fifteen years," and if that be so, it was the duty of the City when it converted Jenkins run, an open stream, into a sewer to take such facts into consideration. Municipalities cannot provide against all floods, and are not required to, but they should at least guard against the effects of rains which occur with such frequency as that, if it can be reasonably done. It is a serious matter to anyone to have his property overflowed, even once in every one or two years. We think, then, there was error in granting the second and sixth prayers.

We do not feel justified in reversing the ruling on the seventh prayer, as the case is presented by the record. So far as it shows, Twenty-second street is not a public street, and the plaintiff testified that he was not disturbed by the water from that direction until that street was opened up. If private parties graded and paved the street and thereby turned the water on Jenkins lane in such quantities as to overflow the plaintiff's property without some default or act of the defendant, it was not liable merely because it did not grade, pave and place gutters in Jenkins lane. The plaintiff said that he was not troubled with the water "before Twenty-second street got cut through"—showing that in grading that

street some barrier was removed which.had protected his property. There is not enough to show that the City ever accepted that street. From what we have said in reference to the sewer it will be seen that we think that the first part of the eighth prayer was objectionable. There was some evidence as to what property was injured by the water from the sewer, and that of itself made the ninth prayer objectionable, but of course the plaintiff must be limited in his recovery, if he recovers at all, to such injuries as are shown to have been from some cause the defendant is responsible for. It follows from what we have said that the tenth should have been rejected.

Before closing this opinion we feel called upon to refer to another question that was suggested by the appellant. He gave as an additional reason why this case should not have been taken from the jury that the jury had by consent viewed the premises. He relied on what was said in *Md. D. & V. Ry. Co.* v. *Hammond,* 110 Md. 124, that: "The defendant's prayers asking the Court to withdraw the case from the jury were properly refused, especially as the jury were by agreement allowed to visit the *locus in quo* and to view the physical conditions at the crossing where the accident occurred." As the appeal was dismissed in that case it was unnecessary to pass on the prayers, although we thought it proper to do so. The Court did not intend, however, to commit itself to the doctrine that because a jury has viewed the *locus in quo* a case cannot be taken from it, for want of legally sufficient evidence. Such a rule would have the effect of preventing the defendant in many cases from consenting to a view by the jury, which is oftentimes desirable and proper, for if every case must go to the jury when it has viewed the *locus in quo* no prudent counsel for a defendant who believed that the plaintiff would not be able to make out a case would consent to it being done.

Courts have differed very much as to the nature and effect of such views, as will be seen by the note to *People* v. *Thorn,* 156 N. Y. 286, as reported in 42 *L. R. A.,* 368, and by reference to *Ency. of Ev.,* 981-989. It is not necessary for us to

go into a lengthy discussion of the subject, but it cannot be doubted that under our practice the Court cannot be prevented from taking a case from a jury, on such ground as the want of evidence legally sufficient to authorize recovery, merely because the jury viewed the *locus in quo*. If there be some fact which can be discovered by the jury on view, which ought to prevent such a disposition of the case, evidence can be produced to prove it, but it would be an unauthorized innovation upon our practice to hold that merely because jurors may be impressed by something they saw, or thought they saw, the Court could not pass upon the legal sufficiency of the evidence on some point necessary to enable the plaintiff to recover, or to defeat recovery. It has often been done in this State in cases in which the jury had viewed the premises.

Although in Massachusetts the Court has adopted the rule that in most cases of view, the jury must of necessity acquire a certain amount of information which they may properly treat as evidence, it was held by the Supreme Court of that State that: "The fact that the jury may have had a view presents no insuperable obstacle to the granting a new trial on the ground that the verdict is against the evidence, or the damages excessive." *Tully* v. *Fitchburg R. Co.*, 134 Mass. 499. And in *McCarty* v. *Fitchburg R. Co.*, 154 Mass. 17, after citing *Tully's Case* and others it said, "if in such cases the Court may set aside the verdict, clearly it may rule that the evidence is insufficient to warrant a verdict. The plaintiff in the present case entirely fails to make it appear in his bill of exceptions that there was anything before the jury, to be derived either from the testimony or from their view of the premises, which would have warranted a verdict for him. Merely stating that the jury took a view of the premises, without showing that anything was to be seen there which would show the duty to build and keep a fence at the place of the plaintiff's entrance upon the railroad track will not entitle the plaintiff to a reversal of the ruling of the presiding Justice." That was a case in which a child of five years of

age strayed from a public street upon the railroad track, and it was contended that a fence should have been there. See also *Riggs* v. *Boston, etc., R. Co.,* 158 Mass. 309.

So without deeming it necessary to determine which line of cases we will adopt on the question of whether the view of the jury can be treated by them as evidence at all, we have no doubt that under our practice when a trial Court is called upon to pass on the legal sufficiency of evidence, it must be governed by the evidence before it, and not by anything which may be locked up in the breasts of the jurors and not be made known to the Court in some proper way. In Eminent Domain proceedings, the jury goes upon the land for the purpose of ascertaining its value, and their view should have more effect than in ordinary cases where they are generally and primarily permitted to go to the *locus in quo* so as to better understand and apply the evidence.

We would add that we have not deemed it necessary to cite authorities on the main question involved in this case, as our decisions have already settled the principles governing such controversies with municipal corporations. Counsel on the respective sides for the most part cited the same cases. This appeal depends upon the legal sufficiency of the evidence, and hence we discussed the facts and not the authorities.

It follows from what we have said above that the judgment must be reversed, and a new trial awarded.

> *Judgment reversed, and a new trial awarded, the appellee to pay the costs above and below.*