# ABRAHAM CORDISH

*vs.*

# SAMUEL BLOOM.

---

# ABRAHAM CORDISH

*vs.*

# MAYOR AND CITY COUNCIL OF BALTIMORE.

*Defective Sidewalk—Liability of City—Evidence as to Proper Construction—Other Accidents at Same Place.*

One cannot recover as for negligence because, a cellar door in the sidewalk being slippery that morning, he fell thereon.

p. 84

A municipality cannot be held responsible for injuries caused by every depression, difference in grade, or unevenness in sidewalks.

p. 85

Baltimore City is liable in damages for injuries caused by the negligent construction of a sidewalk, if it had the work done and paid a proportion of the costs.

pp. 86, 87

In an action against the city and an abutting property owner for personal injuries received while walking in a crowded street, *held* that it was a question for the jury whether there was negligence in constructing the frame for a metal cellar door unnecessarily high above the pavement, and in so placing the door that there was an opening between the door and the frame in which, it was alleged, plaintiff's foot was caught, causing him to fall.

pp. 88, 89

That the jury viewed the *locus in quo* will not prevent the court from taking the case from the jury for lack of evidence.

p. 90

In an action for injuries caused by the alleged defective condition of a cellar door in a street pavement, it was proper to prove how the door could have been constructed so as to avoid the condition complained of.

p. 91

Evidence that accidents to others had occurred at the same place and from the same cause, *held* admissible under the circumstances, both to show notice of the defective conditions and to rebut the defendants' contention that it was impossible for the accident to have happened in the way testified to by plaintiff.                                                              pp. 92, 93

*Decided March 1st, 1921.*

Appeals from the Superior Court of Baltimore City (SOPER, C. J.).

The causes were argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Eugene O'Dunne,* with whom was *Maurice M. Skolkin* on the brief, for the appellant Cordish.

*Edward F. Johnson, Assistant City Solicitor,* with whom were *Roland R. Marchant, City Solicitor,* and *A. Walter Kraus, Assistant City Solicitor,* on the brief, for the Mayor and City Council of Baltimore.

*Louis S. Ashman,* with whom was *Philander B. Briscoe* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the court.

The appellee sued Abraham Cordish, Frank Schwartz and the Mayor and City Council of Baltimore, for injuries alleged to have been sustained by him by reason of his falling on the sidewalk in front of the premises, owned by Cordish and occupied by Schwartz as tenant, known as No. 1022 E. Baltimore Street. The jury rendered a verdict in favor of Schwartz, but against Cordish and the City for $4,000. Separate appeals were taken by Cordish and the City from a judgment entered on the verdict against them. Sixteen exceptions were taken to the rulings of the lower court on testi-

mony and the seventeenth bill of exceptions presents the rulings on the prayers, one of which was offered by the plaintiff as to the measure of damages and granted, the first, second and third of the city were refused and four were granted, and those of Cordish marked No. 4 and No. 5 were granted and No. 1-A, No. 3-A, No. 6-B and No. 8-B were refused—the rejected prayers seeking to take the case from the jury either on the ground that there was no legally sufficient evidence to entitle the plaintiff to recover, or that there was contributory negligence.

There is a cellar under the building and an opening in the sidewalk. The opening is in front of a bay-window, or show-window, as one of the witnesses called it. There is what is spoken of as a frame for the iron door over the opening, which is a part brick and part stone, and is about four feet long and about three feet wide. The iron door is a quarter of an inch thick and is attached to the stone of the frame work by two knuckle hinges, so that it opens towards the building-up against the bay-window. When the door is closed it overlaps the frame a few inches, and at the building line there is an opening of five-eights of an inch between the frame and the cellar door, which gradually tapers to nothing at the end towards the curb of the sidewalk being about one-eighth of an inch at a point half way along the door. The top of the door at the building line is about three inches above the level of the pavement and at the lower end about two and one-quarter inches. The sidewalk is paved with cement and there is a curve of cement from the sidewalk level to the top of the frame, on the east side of it. The sidewalk is about twelve feet wide, leaving an unobstructed space between the frame work of the cellarway and the curb of about nine feet.

The plaintiff testified that he was walking westerly on Baltimore Street on the way to his work, between half past seven and eight o'clock in the morning, that three or four young ladies were walking in a line, arm in arm, and he stepped out of their way to let them pass, when his right foot caught between the frame and the cellar door, that he tried to pull

his foot out, fell over and broke his leg. He said that before he was hurt the young ladies had passed him and, in reply to the question how far in front they were when he got to the cellar door, he answered: "Two and a half or three feet; something like that." He also said that there were a great many people on the pavement at the time, and that he did not know that the cellar door was there, as he usually went to his work another way. He testified that he had on narrow pointed shoes and "it caught me between the cellar door and the frame." He was asked how close he was to the building line when the tip of his shoe got caught in the opening, and replied, "About the middle of the door; I cannot tell exactly." He testified that there was an abrasion on the shoe and his daughter confirmed him as to that. A witness produced by the plaintiff testified that there was quite a crowd walking along the street at the time of the accident, and he was behind the plaintiff and saw him fall; that "there was a stone where the cellar is and he fell over that," and when asked: "You know what part of the cellar he fell on; did you see exactly how he dropped?" He answered: "He fell on to the cellar." A witness called by the defendant, Cordish, testified: "He gave a sudden slip and fell, by his slip, he fell on his leg on the door of the cellar and he held out his hand to me and I picked him up." When asked what caused him to fall, he said: "Just a sudden slip, a sudden push, it was slippery; he fell on the door of the cellar."

There was thus some conflict in the testimony as to what caused him to fall but that was, of course, for the jury, if the case was to be submitted to it, which is the most important question for us to decide. If he in fact fell as described by the witness for the defendant, referred to above, we would have no hesitancy in holding that the plaintiff could not recover, for we would not be willing to hold that there could be a recovery simply because there was a cellar door there in the sidewalk which, being slippery that morning, caused the plaintiff to fall. No municipality nor abutting property owner could be held responsible for an injury thus caused,

without imposing a burden which would be unreasonable, and
if imposed would prevent the use of parts of sidewalks for
purposes which in cities and towns are practically essential to
the proper and reasonable enjoyment of property abutting on
public streets, and in large cities would require the abandon-
ment of the use of important spaces under parts of sidewalks
for cellar entrances, coal chutes, vaults, etc., which would
result in serious losses and a waste of valuable space, which
can be properly utilized without causing much, if any, incon-
venience to the public. But if the accident was caused as the
plaintiff claims, then another question is presented. While a
municipality must generally respond in damages for injuries
caused by its negligence, acts or omissions, especially in con-
nection with the public streets and sidewalks under its care
and control, there must be a limit to such liability, and it
cannot be held responsible for injuries caused by every de-
pression, difference in grade, or unevenness in sidewalks. No
city, town or village could maintain a perfectly level or even
surface in all of its sidewalks without burdening the property
owners with unreasonable and unnecessary taxation. No resi-
dent or visitor of a city, town or village has the right to ex-
pect such conditions. Pavements will in time become irregu-
lar and uneven from roots of trees, heavy rains and snows or
other causes. Steps, porches, areaways, entrances to cellars,
coal chutes and many other things have been and are still per-
mitted on sidewalks in cities and towns, small and large, but
there should be proper regulations, depending upon the loca-
tion and the ordinary use of the various streets, and hence it
is difficult, if not impossible, for courts to announce rules and
principles which can be made applicable to all cases involving
alleged nuisances or negligence. The Court of Appeals said
in *Terry* v. *Perry,* 199 N. Y. 79, 20 Ann. Cases, 796: "This
Court has frequently stated the rules of law governing munic-
ipalities in the care of their streets and sidewalks. Each case
must stand upon its own peculiar facts and the application
of such well known rules of law to such facts."

Was then the lower court right in refusing to take this case
from the jury? It was shown by the son of the defendant,
Cordish, that a change had been made about 1911 in the en-
trance to the cellar, which formerly had two iron doors, in-
stead of one as now, and in answer to the question, "Who did
the work?" the witness answered, "It was done by the city
at that time when they put those wires underground; the city
paid forty per cent. and we paid sixty per cent., and we got
a receipt from the contractor when we made the payment."
He said the city inspectors were there and he presumed that
the work was done under their supervision but was not cer-
tain about that. He also said that they closed up one-half
of the entrance and covered the other half with one of the
iron doors formerly used. He was asked: "You made the
pavement wider?" And answered, "Yes, made it wider; in
fact they asked us to do it at that time; they had to put the
wires underground." There is no contradiction of his testi-
mony and therefore we find that the city had the work done
and paid a proportion of the costs, and we can have no doubt
that it is not relieved from liability by reason of the *Altvater
Case* and others following it. Without deeming it necessary
to discuss them at length, as is well known, there are two dis-
tinct lines of cases in this State in reference to the liability
of Baltimore City. That is due to the unusual conditions
there where the Board of Police Commissioners, who are
State officers, and not the Mayor and Council, have control
of the police, and hence in *Altvater* v. *Baltimore,* 31 Md. 462,
it was held that the city was not responsible for injuries sus-
tained by a pedestrian on a street by being run down by a
sled moving at a rapid rate, as it had no control over the
Police Commissioners, who had excluisve charge of the re-
moval of the nuisance complained of. That case was followed
by *Sinclair* v. *Baltimore,* 59 Md. 592; *Taxi-Cab Co.* v. *Bal-
timore,* 118 Md. 359; *Gutowski* v. *Baltimore,* 127 Md. 502,
and other cases. In *Baltimore* v. *O'Donnell,* 53 Md. 110,
where injuries were received while one of the streets was
undergoing repairs, by reason of the neglect of the contractor

employed by the city, who put a rope across the street and
suspended a lamp from the rope as a warning, which was
broken by some boys, and the person in charge neglected to
repair or replace the lamp and the plaintiff ran into the rope
that night and was injured.  The city was held liable in that
case, which has been followed by a number of cases, such as
*Baltimore* v. *Beck,* 96 Md. 183, for not having a street light
or warning at a place where bricks and other building ma-
terial were lying, which caused the injury to plaintiff; *Bal-
timore* v. *Walker,* 98 Md. 637, for injury sustained by the
plaintiff falling over a stop-box which projected two or three
inches above the pavement; in *McCarthy* v. *Clark,* 115 Md.
454, where a pedestrian fell over a manhole frame left on the
pavement; in *Baltimore* v. *Leonard,* 129 Md. 621, for injury
sustained by the dress of the plaintiff being caught by a stake
projecting about six inches, which was driven in the ground
a few inches from a board which had been laid from the side-
walk to the roadway, so as to enable pedestrians to cross over
a ditch made in connection with the improvement of the
street, and other cases in Baltimore.  The last line of cases
consists of those where the city is "instrumental in creating
the occasion for the obstruction complained of" or takes part
in making or causing it.  The distinction is pointed out in the
cases above cited.  Under the circumstances of this case the
City of Baltimore, therefore, practically occupies the same
position as other cities and towns in the State would be in for
injuries sustained by reason of such alleged defects in the
sidewalk of a public street as exist in the case now before us.
We fully realize the necessity for protecting municipalities
and property owners from unreasonable claims or damages
for injuries sustained from alleged defects on the public
streets, but there are some circumstances which would seem to
have required the negligence *vel non* of the defendants to be
submitted to the jury.  There is evidence that strongly tends
to show that the cellarway was not properly constructed, on
a street which is used as that part of Baltimore Street was
used, when at certain hours of the day crowds of people going

to and from their work were passing this property, and the injury complained of occurred at such a time. If the plaintiff's own testimony was to be believed, and his credibility was not attacked, he was not familiar with that part of the street, did not know that there was a cellar door there, and could not well have seen the opening or height of the door above the level of the pavement by reason of other people passing at the time. It was shown that there were some steps on the street sixteen or eighteen feet east of the cellarway, but they did not project out quite as far as the frame of the cellarway from the building line, according to the architect who testified, but however that may be, it was west of the steps that he stepped to one side to let the young ladies pass.

There was evidence that the pavement was below the level of the frame work about two inches, and there was a curve made of cement which went up to the top of the frame from the cement pavement. On top of the frame the metal door, which was one quarter of an inch thick, was placed, and by reason of the use of the knuckle hinges on top there was an opening between the metal door and the frame work of the size spoken of above. There seems to be some confusion in the record about the height of the top of the metal door above the level of the pavement, but assuming the frame to be two inches above, it was two and seven-eighths inches above the level of the pavement, at the end towards the show-window. The opening at that point is seven inches from the show-window line and, while between the metal door and the curb it tapers off to nothing, the frame work is still above the pavement. When the change was made in 1911 there was no necessity for leaving the frame work so high above the pavement, and still less reason for the opening caused by placing the metal door as it was. An ordinance of the city was introduced in evidence which provided that "All covers for openings in sidewalks should be flush with the pavement and securely fastened and guarded when open." Although we do not mean to hold that the expression "flush with the pavement" must in every case be construed so literally as to make

the city liable for even the slightest variation from that, the testimony shows how easily the door could have been placed so that it would be level with the frame work, and while it was being fixed, the curve in joining the pavement to the frame work could have been avoided by lowering the frame work or raising the concrete pavement gradually to its level, and not have it as the witness described it when he said, "part of the pavement is brought up within about three inches of the edge of this frame work and dished right up like that (indicating), it is not a gradual curve but almost a true curve." Anyone walking along that part of the pavement would have to raise his foot nearly three inches, in order to get it on top of the metal door. While the opening between the metal door and the frame work does taper to nothing, the thickness of the door and the height of the frame work above the pavement was still to be overcome, and it must be remembered that the curve from the pavement to the top of the frame work only began three inches from the latter.

It is not altogether clear how the plaintiff could have caught his foot in the opening, especially towards the middle of the door, where he said he was caught, although he could not be certain about the exact place, but he testified that it was so caught and he and his daughter testified as to the condition of the toe of his shoe after the accident. Then the architect testified, after describing the construction, "and it causes a sort of trap for anyone to catch his foot in." On motion that was struck out and he was then asked without objection: "Without using the word 'trap,' is it big enough to catch the front part of a foot in," and answered, "Oh, yes." Then a witness named Plaine testified: "I myself stumbled over that very trap on Baltimore Street." He said it was about one o'clock in the afternoon, about a year before he saw the plaintiff in the hospital, and upon being asked, "Did any part of your foot get caught," replied, "Part of the toe got caught in there." The plaintiff's daughter also testified that she had seen another man fall there, but judging from the description it was apparently Plaine. Another witness, who was familiar

with the place and saw the plaintiff fall, said: "I told you anybody who passed there and got his foot hooked in the door would fall," but that witness also said that in the thirteen years he had lived in the neighborhood he had not seen any other person fall. Still another witness testified that he fell on that cellar door the summer before he was testifying. He explained how he fell by saying, "I come in that store right often and one time I come in the store and I was told that some fellow was looking for me who was just in the store and I left the store and my foot got hooked in the cellar door and I fell down, that's all I know." That witness also said that the door would be raised higher when there is dirt in between the door and the frame, that he was running past the cellar door quickly and if he had looked he would not have fallen.

Reference was made by the appellee to the fact that the jury by consent visited the premises and saw the actual conditions. The case of *Maryland, D. & V. Railway* v. *Hammond,* 110 Md. 126, was cited, where it was said that "the defendant's prayers asking the court to withdraw the case from the jury were properly refused, especially as the jury were by agreement allowed to visit the *locus in quo,* etc. We said in *Kurrle* v. *Baltimore,* 113 Md. 75, that "it cannot be doubted that under our practice the court cannot be prevented from taking a case from the jury, on such ground as the want of evidence legally sufficient to authorize recovery, merely because the jury viewed the *locus in quo.* If there be some fact which can be discovered by the jury on view, which ought to prevent such a disposition of the case, evidence can be produced to prove it," etc. But the court, in determining whether there is legally sufficient evidence to entitle the plaintiff to recover to go to the jury, could take into consideration the fact that the jury had viewed the premises, and could thereby get a better understanding of the conditions, if evidence as to them had been offered before the court and jury, but could not be as clearly presented by photographs and oral testimony as by the aid of a view of the premises themselves.

We have referred at unusual length to the evidence, and we have referred to some which was excepted to but which we think was admissible, as will be shown later, and we have reached the conclusion that there was no error in rejecting the city's prayers No. 1 and No. 2 and Cordish's prayer No. 1-A as to the legal sufficiency of the evidence. We will not prolong this opinion by quoting from our decisions as to when a case should be submitted to the jury, as the principle is too well settled and too frequently referred to, to require us to do so. We are also of the opinion that the city's prayer No. 3 and Cordish's prayers No. 3-A, No. 6-B and No. 8-B, in reference to contributory negligence, were properly rejected. The prayers granted for the several defendants on the subject covered the ground as favorably as they had the right to ask. We will not quote from our decisions on this point but will refer to *McCarthy* v. *Clark, supra; Annapolis* v. *Stallings,* 125 Md. 343; *Delmar* v. *Venables,* 125 Md. 471; and *Baltimore* v. *Mallern,* 133 Md. 14, as among the recent cases which have discussed the subject.

It only remains to refer to the exceptions to rulings on the admissibility of evidence. What we have already said indicates our views on the more important ones. There certainly was no reversible error in the first exception. It was proper to prove, as was done in the second exception, how the cellar door could have been constructed so as to avoid the conditions complained of. It is true that neither the city nor the owner of the property was required to use the very best methods, if several were proper, but if this accident could have been avoided by adopting such simple methods as those suggested by the architect, it would not be unreasonable to require the changes to be made. The third, fourth, fifth, sixth and eighth exceptions, which relate to the testimony as to injuries sustained by other persons by this cellarway, can be considered together. In *Terry* v. *Perry, supra,* the Court of Appeals of that State referred to a number of cases to the effect that a municipality would not be held, as a matter of law, responsible for injuries arising from slight depressions or differences

in grade of sidewalks, except when the depression is peculiar and especially calculated to result in injury to pedestrians, and held that the defect in that case was so slight that it was not in excess of similar defects found in great numbers in every village and city, and then went on to say: "In cases where the depression or difference in grade is slight, even where under the rules of this Court they are so slight that as a matter of law they are not ordinarily sufficient on which to base a recovery against a municipality, evidence of the experience of others in tripping or falling over the same is competent for the purpose of showing, if true, that there is something peculiar or unusual about the formation of the difference in grade or of the depression that makes it dangerous to an extent that an ordinarily prudent person in charge of sidewalks, with knowledge of such peculiar depression, would repair it." Amongst other cases cited was *Gastel* v. *New York,* 194 N. Y. 15, 16 Ann. Cases, 635. The author of the note in 16 *Ann. Cases* (p. 637) has collected a great many cases, the great majority of which held that the evidence of other accidents at the same place was admissible, although there are a number of cases in other states to the contrary. Amongst those permitting the evidence are *District of Columbia* v. *Armes,* 107 U. S. 519, where it was said: "The frequency of accidents at a particular place would seem to be good evidence of its dangerous character,—at least, it is some evidence to that effect," and *Kankakee* v. *Phipps,* 135 Ill. App. 585, where the court said: "Evidence of similar accidents from the same cause is competent, not for the purpose of showing independent acts of negligence, but as tending to show that the common cause of the accidents is a dangerous, unsafe thing." The annotator said the rule has been applied in actions for injuries received by pedestrians in falling into a coal hole, area-way, or similar opening in the sidewalk, citing *Augusta* v. *Hafers,* 61 Ga. 48, 34 Am. Rep. 95; *Chicago* v. *Jarvis,* 226 Ill. 614, 80 N. E. 1079. He cites many cases to show that when it is incumbent on the plaintiff to prove notice it is admissible, and he says the rule has been most

frequently applied to actions for injuries received by a pedestrian by reason of a defect in the construction of the sidewalk, but as stated above he cites cases from a number of states to show that such evidence is not admissible for any purpose.

In *Wise* v. *Ackerman,* 76 Md. 391, JUDGE ALVEY, after stating the general rule that evidence of other similar occurrences on other occasions is not admissible to raise a presumption that the accident complained of happened in a particular manner, or that it occurred without the fault of the plaintiff but by the neglect and want of care of the defendant, said: "The facts of the particular transaction are the only legitimate evidence of the injury and the manner and cause of its occurrence and not other and different occurrences," and went on to say that that was "not analogous to the case of an attempt to affect a defendant with knowledge of a negligent habit of an employee * * * nor to that of a case of a latent defect in machinery, or want of repair in a road or bridge, and the simple fact of a former accident is allowed to be proved as means of affecting the defendant with or bringing home to him knowledge of such supposed negligent habit, or defect or want of repair." Now in this case, although there was evidence that the city had the work done, and hence the notice may not have been necessary, yet the plaintiff was not required to rely on one ground of liability, if he thought he had more than one, and in proving notice of the defect it could be done by showing that other accidents had occurred at the same place. Indeed as in this case the defendants contend, as they do in this Court, that it was impossible for the accident to have happened as the plaintiff said it did, it would seem to be very pertinent evidence to show that others were injured in the same way, and that could be done without conflicting with what was said in *Wise* v. *Ackerman.* We are of the opinion that such evidence, under the peculiar circumstances of this case, was admissible. As we find no reversible error in any of the remaining exceptions,

and do not deem it necessary to refer further to them, it follows that the judgment must be affirmed.

It is perhaps well to add that we have referred more to the City of Baltimore in what we have said than to the property owner, because there were reasons alleged for it not being liable which would not apply to him, but what we have said is sufficient to show that we are of the opinion that the case was properly submitted to the jury as to both defendants, and there was no reversible error affecting either.

*Judgment affirmed in both appeals, each appellant to pay one-half of the costs.*