# MARTHA AUSTIN *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 132, September Term, 1978.]

*Decided September 13, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH and COLE, JJ.

*Paul D. Bekman* and *William H. Engelman,* with whom were *Harriet E. Cooperman* and *Kaplan, Heyman, Greenberg, Engelman & Belgrade, P.A.* on the brief, for appellant.

*Amicus curiae* brief filed by Maryland Trial Lawyers' Association, Inc., *Leo A. Hughes, Jr.,* and *David E. Furrer* on the brief.

*William R. Phelan, Jr., Assistant City Solicitor,* with whom were *Benjamin L. Brown, City Solicitor, William Hughes, Associate City Solicitor,* and *Otho M. Thompson, Chief Solicitor,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court. ELDRIDGE, J.,

filed an opinion concurring in part and dissenting in part, in which SMITH, J., concurs with Part I, at page 67 *infra*. COLE, J., filed a dissenting opinion at page 78 *infra*.

"The doctrine of sovereign immunity from suit, rooted in the ancient common law, is firmly embedded in the law of Maryland." [1] *Katz v. Wash. Suburban Sanitary Com'n,* 284 Md. 503, 507, 397 A.2d 1027 [, 1030] (1979). The doctrine today is, perhaps, more accurately characterized as "governmental immunity," for, by judicial decision, it is not only applicable to the State itself, but also applies generally to a county of the State and to the State's municipal political subdivisions and local agencies, unless the General Assembly either directly or by necessary implication has waived the immunity. *Godwin v. County Comm'rs,* 256 Md. 326, 334, 260 A.2d 295 (1970). Unlike the total immunity from tort liability which the State and its agencies possess, the immunity of counties, municipalities and local agencies is limited to tortious conduct which occurred in the exercise of a "governmental" rather than a "proprietary" function.[2] *Katz,* 284 Md. at 508, n. 3 [, 379 A.2d at 1010, n. 3]; *O & B, Inc. v. Md.-Nat'l Cap. P. & P.,* 279 Md. 459, 462, 369 A.2d 553 (1977) and cases therein cited. That is

> a municipality or county [or local agency] is liable for its torts if it acts in a private or proprietary capacity, while it is immune if acting in a governmental capacity. To the extent that a [municipality,] county [or local agency] is liable in tort actions, it is also responsible under the doctrine of *respondeat superior* for the tortious conduct of its employees which occurs in the scope of their employment. However, the nature of [the] liability under this doctrine is derivative so that nonliability, immunity, or release of the employee precludes recovery from the principal-[employer]. [*Bradshaw v. Prince*

---

1. It was noted in State v. B. & O. R. R. Co., 34 Md. 344, 374 (1871): "The right to sue the State was given by the Act of 1786, ch. 53, but this was afterwards repealed and the right was taken away." *See* Acts 1820, ch. 210.

2. The Legislature waived the State's immunity from suit in certain contract actions by Acts 1976, ch. 450, now codified as Maryland Code (1957, 1978 Repl. Vol.) Art. 41, § 10A.

*George's County,* 284 Md. 294, 300, 396 A.2d 255 (1979).]

This case provides occasion to mount yet another attack on the doctrine as applied in this State. Martha Austin, as mother and next friend of Camille Austin, deceased, and as personal representative of the estate of her daughter, instituted an *ex delicto* action in the Superior Court of Baltimore City against the Mayor and City Council of Baltimore. A jury rendered verdicts in her favor as mother and next friend (1st count) in the amount of $1,435.10, and as personal representative (2nd count) in the amount of $150,000. *See* note 4 *infra.* Upon direct appeal by the City, the Court of Special Appeals reversed the judgments. *City of Baltimore v. Austin,* 40 Md. App. 557, 392 A.2d 1140 (1978). We granted the mother's petition for the issuance of a writ of certiorari.

Mrs. Austin requests that we "judicially abrogate the doctrine of municipal immunity from tort liability." We decline to do so.

If such doctrine is to remain in effect, however, she would have us establish a new standard for determining whether a municipality, when committing a tort, was exercising a governmental function or a proprietary function. We are not persuaded to alter the existing law in this respect.

She then claims that even under the present governmental-proprietary test, the Court of Special Appeals improperly concluded that in the circumstances here the City was exercising a governmental function. Therefore, she urges, the intermediate appellate court was wrong in holding that the trial court erred in finding that the function exercised by the City was proprietary and in refusing to grant the City's motion raising a preliminary objection based upon sovereign immunity. *Austin,* 40 Md. App. at 572.

I

We set out our position regarding sovereign immunity in *Board v. John K. Ruff, Inc.,* 278 Md. 580, 366 A.2d 360 (1976):

Once venerated, recently vilified, and presently

substantially limited, the doctrine of sovereign immunity has been long recognized by this Court. We have applied the doctrine for over a century, and a compendium of our discussions regarding it, from *State v. B. & O. R. R. Co.,* 34 Md. 344 (1871), *aff'd,* 21 Wall. 456 (1875) to *Calvert Associates v. Department,* 277 Md. 372, 357 A.2d 839 (1976), was set out in *American Structures v. City of Balto.,* 278 Md. 356, 359, 364 A.2d 55, 56 (1976). . . .

The frequent and increasingly vigorous attacks upon the doctrine have been no more persistent than our refusal to abrogate or modify it by judicial fiat. We have consistently adhered to the view that ". . . it is desirable and in the public interest that any change in the doctrine of sovereign immunity should come from the legislative branch of the State Government rather than from the judicial branch inasmuch as there are fiscal considerations, administrative difficulties and other problems in balancing the rights of the State and its agencies with new possible rights of the individual citizens, which can far better be considered and resolved by the legislative branch than by the judiciary of the State." *Jekofsky v. State Roads Comm'n,* 264 Md. 471, 474, 287 A.2d 40, 42 (1972). [278 Md. at 584.]

The General Assembly is certainly aware of the reasons which have been advanced for the abrogation of the doctrine and of its alteration, modification or abolishment in many other states, but it has permitted its tenets with respect to municipal tort liability to stand and has chosen not to act in the face of repeated reminders of its role in the matter in the opinions of this Court. *See, for example, State v. Baltimore County,* 218 Md. 271, 273, 146 A.2d 28 (1958); *Weisner v. Bd. of Education,* 237 Md. 391, 395, 206 A.2d 560 (1965); *Godwin v. County Comm'rs,* 256 Md. at 333; *Duncan v. Koustenis,* 260 Md. 98, 104, 271 A.2d 547 (1970); *Robinson v. Bd. of County Comm'rs,* 262 Md. 342, 345, 278 A.2d 71 (1971); *Jekofsky v. State Roads Comm'n,* 264 Md. 471, 474, 287 A.2d 40 (1972); *Quecedo v. Montgomery County,* 264 Md. 590, 595, 287 A.2d

257 (1972); *Spriggs v. Levitt & Sons, Inc.,* 267 Md. 679, 685, 298 A.2d 442 (1973); *Bradshaw v. Prince George's County,* 284 Md. at 300. We declared our view this way in *Robinson:*

> Robinson, con brio, importunes us to renounce those tenets "deeply ingrained in the law of Maryland," to enlist in the crusade against sovereign immunity and to join the ranks of those courts already marching under the pennons of the law professors. We shall not do so because we have said quite often that this is a province of the legislative bodies we ought not to invade. [262 Md. at 345 (footnotes omitted).]

And in *Bradshaw* we pointed out that

> [w]e have consistently refused to "enlist in the crusade against sovereign immunity and to join the ranks of those courts" which have judicially abrogated the doctrine. . . . We have stated that *any waiver of immunity* must emanate from the legislature. [284 Md. at 300 (citations omitted; emphasis added).]

It is manifest that our position, long firmly established, that if there is to be further change in the doctrine the legislature should make it, encompasses not only the ancient common law concept but also the engrafting thereon by judicial opinion the aspect of municipal tort liability.[3]

At the hub of our persistent refusal to abrogate by judicial decision the doctrine of sovereign immunity followed in this State, even as limited with respect to tort liability of

---

3. The law is well established that the State or one of its agencies may not by affirmative action or by failure to plead the defense, waive the defense of governmental immunity in the absence of express statutory authorization, or by necessary implication from a statute. Bd. of Education v. Alcrymat Corp., 258 Md. 508, 516, 266 A.2d 349 (1970). *See* Maryland Rule 323; Board v. John K. Ruff, Inc., 278 Md. 580, 583, n. 2, 366 A.2d.360 (1976).

The decisions in this State have also "established that neither in contract nor tort can a suit be maintained against a government agency, first, where specific legislative authority has not been given [, and] second, even though such authority is given, if there are no funds available for the satisfaction of the judgment, or no power reposed in the agency for the raising of funds necessary to satisfy a recovery against it." University of Maryland v. Maas, 173 Md. 554, 558-559, 197 A. 123 (1938). *See* John K. Ruff, Inc., 278 Md. at 591.

municipalities, counties and local agencies, is our desire to preserve the consistency and stability in this Court's rulings which are necessary for our citizens to know their respective rights and obligations. *Herring v. Christensen,* 252 Md. 240, 242, 249 A.2d 718 (1969). We are not insensitive to the problems sometimes presented by individual cases. We said long ago in *Demuth v. Old Town Bank,* 85 Md. 315, 37 A. 266 (1897): "It is often difficult to resist the influence which a palpable hardship is calculated to exert; but," we added, "a rigid adherence to fundamental principles at all times and a stern insensibility to the results which an unvarying enforcement of those principles may occasionally entail, are the surest, if not the only, means by which stability and certainty in the administration of the law may be secured." *Id.* at 320. We declared then:

> It is for the Legislature by appropriate enactments and not for the Courts by metaphysical refinements to provide a remedy against the happening of hardships which may result from the consistent application of established legal principles. [*Id.*]

We observed in *Geier v. Merc.-Safe Dep. & Tr. Co.,* 273 Md. 102, 328 A.2d 311 (1974), rehearing denied (1975), that *stare decisis* is usually the wise policy, particularly "in areas where corrective action can be taken prospectively by the legislature. . . ." *Id.* at 124. We have noted that "[t]he doctrine of *stare decisis,* important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life." *White v. King,* 244 Md. 348, 354, 223 A.2d 763 (1966). We cannot say, however, that the doctrine of sovereign or governmental immunity "has become unsound in the circumstances of modern life." There are two sides to the question. "[E]ven though in particular instances serious loss may be thereby inflicted on some individuals," *Demuth,* 85 Md. at 320, the doctrine involves important and far-reaching legislative and executive responsibilities and entails sound public policy. We recognized this over a hundred years ago:

[Sovereign] immunity belongs to the State by reason

of her prerogative as a sovereign, and on grounds of public policy. Parties having claims or demands against her, must present them through another department of the Government — the Legislature — and cannot assert them by suit in the courts. [State v. B. & O. R. R. Co., 34 Md. at 374.]

We affirmed this belief in *Baltimore v. State, ex rel. Blueford,* 173 Md. 267, 195 A. 571 (1937), hereafter referred to as *Blueford:*

The reason for the immunity is that, to subject the state to the coercive control of its own agencies would not only be inconsistent with its sovereignty, but would so hamper and impede the orderly exercise of its executive and administrative powers as to prevent the proper and adequate performance of its governmental functions. [*Id.* at 271.]

And, most recently in *Katz v. Wash. Suburban Sanitary Com'n, supra,* we said:

Although originally based on the tenet that "the King can do no wrong," the doctrine is presently viewed as a rule of policy which protects the State from burdensome interference with its governmental functions and preserves its control over State agencies and funds. [284 Md. at 507 [, 397 A.2d at 1030].]

We abide by our position that the task of abrogating or altering the doctrine of sovereign or governmental immunity is one to be performed by the legislature.

## II

Mrs. Austin urges that if we do not abrogate the doctrine of sovereign immunity, we should, nonetheless, "establish a new standard to determine if a given activity is governmental or proprietary in nature." She asserts that the present test is "irrational, unjust and unworkable." We have noticed that

[i]t is often difficult to determine in a particular

> instance whether the duty involved is in the exercise or neglect of the municipality's governmental or political functions or of its ministerial and private or corporate functions. The decisions do not furnish a satisfactory test, as they are conflicting in their reasoning and conclusions. [*Baltimore v. Eagers,* 167 Md. 128, 136, 173 A. 56 (1934).]

This observation led to our statement in *Baltimore v. State, ex rel. Ahrens,* 168 Md. 619, 179 A. 169 (1935), hereafter referred to as *Ahrens,* that

> the line of demarcation between private, corporate, and ministerial, and governmental, political, and discretionary activities or functions of municipalities is difficult to discern, and more difficult to define. [*Id.* at 625.]

We have noted that "[t]he distinction between governmental and proprietary functions is sometimes illusory in practice." *E. Eyring Co. v. City of Baltimore,* 253 Md. 380, 382, 252 A.2d 824 (1969). We quoted, *id.,* from Seasongood, *Municipal Corporations: Objections To The Governmental Or Proprietary Test,* 22 Va. L. Rev. 910 (1936): "The rules sought to be established . . . are as logical as those governing French irregular verbs." However, we asserted in *Eyring,* that having "recognized the difficulty in distinguishing between those functions which are governmental and those which are not, [we had] established guidelines in [*Blueford*]." After quoting the *Blueford* observation that "in truth there is no universally accepted or all inclusive test to determine whether a given act of a municipality is private or governmental in its nature, but the question is usually determined by the public policy recognized in the jurisdiction where it arises," we repeated the guidelines set out in *Blueford* at 275-276:

> Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element

of private interest, it is governmental in its nature. [*Eyring,* 253 Md. at 383.]

We explained in *Blueford* that

it is better that the adequate performance of such an act be secured by public prosecution and punishment of officials, who violate the duties imposed upon them in respect to it, than to disburse public funds, dedicated to the maintenance of such public conveniences as public parks, playgrounds, hospitals, swimming pools, and beaches, maintained at the public expense, to private persons who have suffered loss through the negligence or default of municipal employees or agents charged with their management. [173 Md. at 276.]

Mrs. Austin suggests that we adopt the test set out by the Supreme Court of Michigan in *Pichette v. Manistique Public Schools,* 403 Mich. 268, 269 N.W.2d 143 (1978). Boiled down, this test recognizes as governmental the decision to perform a function and as proprietary the actual performance of the function. That is, deciding whether to operate and supervise a playground or swimming pool is a governmental function, but the operation and supervision of the playground and swimming pool comprises a proprietary function. In practical effect, this test abrogates, to all intent and purpose, the doctrine of sovereign or governmental immunity, and, this, we have decided, should not be done by judicial decision. Although aware that the guidelines we have established are at times difficult to apply, we do not believe that they are "irrational, unjust and unworkable." They were developed over a period of years by decisions of this Court on a rational basis. They are consistent with sound public policy. They have worked effectively in their application to divers factual situations. We agree with the City's analysis:

A shift to a new test such as the one proposed . . . would involve a severe restriction of the scope of the concept of "governmental function" as presently defined by the Court. Such a shift would represent a major change in the law of governmental immunity

and would truly indicate a break with the previous direction and decisions of the Court. The choice is not between a rational test and an irrational test. The choice is between a test which would allow a municipality to undertake a number of activities . . . as governmental functions and a test which would severely limit the concept of governmental function. The [present] test [takes] into account the carefully worked-out past decisions of the Court of Appeals and . . . continue[s] the basic public policy contained in them. The [new] test . . . would represent a shift in policy and an entirely new approach to the issue of governmental functions.

We shall honor *stare decisis* in this matter also and adhere to our established guidelines.

### III

The Court of Special Appeals set out the circumstances surrounding the death of Camille Austin.

In July of 1974, the Department of Recreation and Parks of the City of Baltimore, through the Bureau of Recreation, one of its subdepartments, operated a day camp for children located at the City's Cahill Recreation Center. The day camp was designated as Camp Cahill. Enrollment in the camp was open to children who applied from a particular area of Baltimore and a fee of $3.50 a week was set as the charge for participation in the program. The payment of the weekly fee was in some instances adjusted or waived, and children were permitted to participate if they were able to pay only part of the fee or even if they were not able to pay any fee at all. Nonpaying campers were offered the same services as those who paid and persons not enrolled in the day care program were permitted to participate in camp activities at Cahill Center. Campers going on bus trips arranged by the camp

62

director paid an additional fee which was set at different rates for campers and noncampers.

The director of Camp Cahill was required to prepare and submit for approval a proposed budget to the Department of Recreation and Parks. The budget, as prepared, contemplated receipts of $7,000.00 to be paid by 250 campers at the rate of $3.50 per week for eight weeks. Expenditures included the cost of: hiring three additional leaders (for a total number of six leaders); providing milk or juice each day; hiring transportation for regular and special field trips; and purchasing arts and crafts supplies, postage and camp equipment. All money collected by the camp was remitted to the Department of Recreation, and all bills were paid by the Department. The program was subsidized by the City.

On July 19, 1974, a special chartered bus transported to Greenbrier State Park those members of the Cahill Camp who had paid the required bus fees and who had been given permission by their parents or guardians to participate in the trip outside the City of Baltimore. Greenbrier State Park is in Washington County, Maryland, approximately 90 miles from Baltimore. Camille Austin was one of the campers on the trip. Although Camille could not swim, she was permitted to go into the water without supervision. She drowned. It was admitted that no instructions, guidelines or special operating procedures were promulgated by the camp director for the safety of the children who were allowed to go into the water.

Clarice Patterson, the Senior Director of Cahill Recreation Center at the time of the accident, reported to a District Supervisor who in turn reported to the Superintendent of the Bureau of Recreation. The Superintendent was under the supervision of the Director of Parks who was answerable to the Mayor and City Council. Ms.

Patterson, as the head of Camp Cahill, was charged
with administering the programs at the camp within
guidelines issued by the Department. Scheduled
trips were arranged by Ms. Patterson, and it was
also her responsibility to arrange for transportation
to and from the designated trip area. The camp
leaders were under her direction and control. [*City
of Baltimore v. Austin,* 40 Md. App. at 558-559.]

We have declined to abrogate the doctrine of governmental
immunity with respect to the tort liability of municipalities.
Therefore, the defense of governmental immunity was
available to the City. We have also determined to adhere to
our established guidelines for determining whether a
municipality is performing a governmental function so as to
be immune or a proprietary function so as to be liable.
Applying those guidelines, we agree with the Court of Special
Appeals that the negligence of the City occurred during the
performance by it of a governmental function. Thus, it may
not be held responsible for the damages suffered.[4]

We believe that *Blueford, supra,* is controlling. In that case
the question was whether the management and maintenance
of a public swimming pool in a public park by Baltimore City
was a governmental function. We first assumed on the
authority of *Ahrens, supra,* that "the maintenance and
management of a public park is a governmental function. . . ."
*Blueford,* 173 Md. at 273. We next concluded that the
maintenance and operation of such a public convenience as
a swimming pool was also a governmental function. We
summarized the reasoning of *Ahrens,* expressed by Mitchell,
J., "speaking with force and clarity for this Court":

[P]ublic parks are vitally necessary to the public
health and welfare, in the congested centers of

---

4. The City did not contest on appeal the jury's finding that it was
negligent, and that this negligence caused the death of Camille Austin. Nor
did it question the reasonableness of the damages awarded. City of Baltimore
v. Austin, 40 Md. App. 557, 564, 392 A.2d 1140 (1978).

It seems that the court in instructing the jury and the clerk in asking for
its verdicts, reversed the counts of the declaration so that the jury apparently
intended to award $150,000 to Mrs. Austin as mother and next friend and
$1,435.10 to her as personal representative (funeral expenses $977.50 and
grave marker $457.60). We do not find from the record that this matter was
noticed below.

population, in affording a temporary escape from the noise and dust and jostling of crowded city streets. So, too, swimming or wading pools and other public facilities for bathing have a direct and necessary relation to the public health in affording to the masses who are unable to go to the seashore or to inland lakes, or ponds or streams beyond the city, some opportunity of lessening the dangers and discomforts which are inseparable from the depressing and exhausting heat of the summer season. Such pools are maintained solely for the public comfort and convenience, the municipality derives no profit from them, they do afford the public relief from conditions which might otherwise be intolerable and dangerous, which many of them could secure in no other way. [*Blueford,* 173 Md. at 274.]

Our determination in *Blueford* that the City was performing a governmental function was not affected by the fact that the maintaining of public parks in Baltimore City was permissive, nor by the fact that there was no specific authority for the maintenance of swimming pools, "for they may naturally be included in the authority to maintain the parks in which they are located and of which they are a part." *Id.* at 276. Nor was it affected by the fact that a minimal fee was exacted for the privilege of using the pool, "for in the eleven years of its existence the fees collected have never been sufficient to pay the expenses of maintaining the pool, and the deficit has been met from the general funds of the City." *Id.* at 276-277.

Consistent with our conclusions in *Blueford,* we think that the operation of Camp Cahill and the activities related to it, including the activity during which Camille died, were sanctioned by legislative authority. On 3 November 1964, the people of Baltimore City voted to amend the 1949 edition of the City Charter, pursuant to Md. Const. Art. XI-A, § 1. Section 2 of Art. XI-A requires the General Assembly to provide a grant of express powers limiting the powers under a charter adopted pursuant to § 1. These express powers are

set out in Code (1957, 1973 Repl. Vol.) Art. 25A, § 5. *See* Code (1957, 1976 Repl. Vol.) Art. 1, § 14. Subsection (V) of Art. 25A, § 5, under the heading "Recreation," grants the power

> To enact local laws providing for the development and administration of a comprehensive recreational program including the construction, equipment and use of park, community center, and recreational buildings and facilities, the acquisition of sites therefor, and the furnishing of recreational and other municipal services in connection therewith.

Baltimore City, Md. Charter, Art. II (21) bestowed upon the Mayor and City Council of Baltimore the power "[t]o establish, maintain, control and regulate parks, squares, monuments and *recreation facilities.*" (Emphasis added). Article VII, §§ 61-64 of the Charter created a Department of Recreation and Parks and enumerated its powers and duties, including "to establish, maintain, operate and control ... recreational facilities and activities for the people of Baltimore City, and to have charge and control of all such property and activities belonging to or conducted by, the City. ..." § 63 (a). The Department has the power "to rent for its use buildings and other places suitable for the conduct of the activities of the Department" and is authorized, with the consent of any other municipal agency, to organize and conduct play and recreational activities on grounds and in buildings under the control of such other agency. ..." § 63 (d). It may "charge and collect fees for admission, services and the use of facilities. ..." § 63 (g). The Department's activities here involved were clearly within its powers and authority.

It is readily apparent that the City's activities with which we are here concerned were solely for the public benefit, with no profit or emolument inuring to the municipality, that they tended to benefit the public health and promote the welfare of the whole public, and that they had no element of private interest. We are in full accord with the Court of Special Appeals that

> the establishment of day camp facilities operating in

> congested areas of the city for the benefit of those children who would otherwise have no access to the programs offered is necessary for the public health, welfare and education. There can be no question that the programs offered are a needed alternative for our neglected poor children who would, if it were not for the camp opportunity, face conditions in the city which are intolerable. [*Austin,* 40 Md. App. at 571.]

Although the fees projected when the Camp Cahill budget was proposed may have generated sufficient funds to cover day-to-day expenses of the camp, it is "obvious," as the Court of Special Appeals ascertained, "that the City had a substantial capital investment in the Camp Cahill Recreation Center, and that it was required to subsidize the day-to-day operation of the Center and the day camp." *Id.* at 570. We believe, as the intermediate appellate court believed, that the fees here did not result in a profit or emolument inuring to the City within the contemplation of the *Blueford* guidelines. In short, when viewed in the light of the public policy recognized in Baltimore City, and the controlling guidelines, the function here performed by the City was governmental.

> The City's election to furnish the day camp facilities to its citizens was a permitted exercise of its judgment as to the necessity for the program in the interest of the health, welfare and education of its children. To deny the City the protection of its cloak of governmental immunity in the operation of an activity necessary to the health, education and welfare of its children must have a chilling effect on the ability and willingness of the City to continue to furnish that vitally needed service in the future. [*Austin,* 40 Md. App. at 572.]

> > *Judgment of the Court of Special Appeals affirmed; costs to be paid by petitioner.*[5]

5. The Maryland Trial Lawyers' Association, Inc. filed a brief as *amicus curiae* which included the contention that the doctrine of sovereign immunity is unconstitutional as violative of the rights of due process and equal

*Eldridge, J., concurring in part and dissenting in part:*

I agree with the majority, although my reasons are somewhat different, that the Court should not now modify the doctrine that the *state* government enjoys immunity from suit unless waived in particular instances. In my view, in light of the particular history of sovereign immunity in Maryland, any change ought to come from the General Assembly. On the other hand, I agree with the second part of Judge Cole's dissenting opinion that we should abandon the governmental-proprietary test for determining the immunity of municipalities and counties from tort suit. This distinction has no rational basis in the operation of local government, leads to arbitrary results, and has been abandoned by most of the sister jurisdictions from which this Court borrowed it at a relatively late date. Instead, we should abrogate the governmental-proprietary distinction, and limit the governmental immunity from tort suits of counties and municipalities to those discretionary or policy-making decisions of the local governments. However, once the policy has been made to engage in a certain activity or function, counties and municipalities should be held liable, the same as private corporations, for the negligence of their employees in the performance of the activities. This would largely be a return to the holdings of this Court throughout most of its history, that counties and municipalities are generally liable when, in carrying out their operations, they negligently cause injuries.

## I.

In many states of this country, the following historical pattern with regard to sovereign immunity was more or less

---

protection of the law. The question was not raised, argued or decided at trial or before the Court of Special Appeals. It is not properly before us, and we do not consider it. Matter of Trader, 272 Md. 364, 401, 325 A.2d 398 (1974); Maryland Rule 885.

The Court of Special Appeals assessed the costs on the appeal before it against the Mayor and City Council of Baltimore even though that party prevailed. *See* Md. Rule 1082 a. We have serious doubt of the propriety of the award, despite the discretionary power of the court. However, as the City did not file a cross-petition for a writ of certiorari raising the issue, the matter is not before us, and we offer no further comment concerning it.

typical: the question of the immunity of the state government from suit was initially dealt with by the courts; the State was accorded immunity by judicial decision; the state legislature did not act with respect to sovereign immunity generally despite many suggestions to this effect by the courts; and finally the courts themselves reexamined the doctrine, abrogating or modifying it in light of present-day experiences and beliefs. If this typical pattern had existed in Maryland, our refusal to reconsider the State's immunity from suit could not be justified, as the majority opinion seems to do, simply by relying on the principle of stare decisis and "our desire to preserve the consistency and stability in this Court's rulings."

In many areas of the law, such as testamentary law, property law, or commercial law for example, people do plan and arrange their affairs for the future in reliance upon this Court's prior rulings, and thus we should be quite reluctant to depart from the principle of stare decisis. However, in other areas of law this is not as true. In arranging their affairs, our citizens do not take into consideration whether they shall be able to recover if negligently injured by the State. If anything, people assume as a general matter that, if they are negligently injured or killed, there will likely be compensation from the tortfeasor.

As this Court has pointed out many times, and as Judge Cole points out in his dissenting opinion in the instant case, the common law is not a static thing; it can be modified by judicial decision; and on occasions it should be modified where present-day experiences and beliefs justify such action. In several instances, particularly in the tort and criminal areas of the law, this Court has changed or extended common law principles. *E.g., Lewis v. State,* 285 Md. 705, 404 A.2d 1073 (1979); *Pope v. State,* 284 Md. 309, 341-342, 396 A.2d 1054 (1979); *Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978); *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976); *Lightfoot v. State,* 278 Md. 231, 237-238, 360 A.2d 426 (1976); *Shilkret v. Annapolis Emergency Hosp.,* 276 Md. 187, 349 A.2d 245 (1975).

Consequently, if the only reason for refusing to re-examine

the merits of the sovereign immunity doctrine was the principle of stare decisis, I would consider such reason insufficient. However, as to the immunity from suit of the State of Maryland, there is a sound historical basis for us to continue treating this as a matter exclusively for the Legislature.

The typical pattern regarding the development of sovereign immunity in many other states, as previously outlined, did not occur in Maryland. Here, the question of the State's immunity from suit was not initially dealt with by the courts, but was in the beginning taken up by the Legislature. Moreover, the Legislature in recent times has not refused to consider the matter; instead it has enacted comprehensive legislation dealing with it.

Long before the first mention of sovereign immunity in the reports of this Court, the General Assembly enacted a broad statute. By Ch. 53 of the Acts of 1786, it was provided that "any citizen of this State, having any claim against this State for money, may commence and prosecute his action at law for the same against this State as defendant . . . ." The preamble to the statute reflects the legislative policy determination that "it is reasonable that some mode should be adopted to afford such individuals [having claims against the State] an opportunity of trying the justice of their claims at law." The statute went on to set forth procedures for filing such actions, gave the right of jury trial, provided for defense of cases by the Attorney General, etc.

The General Assembly again turned its attention to suits against the State by Ch. 210 of the Acts of 1820, passed February 17, 1821, which broadly repealed the 1786 act. Recognizing that the repeal reflected the legislative intent that there should no longer be actions at law against the State, the 1821 statute provided that it should not be construed "to affect any suit now depending in any court . . . ."

More recently, the legislative and executive branches of government again considered the State's immunity from suit. In 1974, the General Assembly passed House Bill No. 5, designed to remove the defense of sovereign immunity in *ex*

70

*contractu* actions. However, the Governor vetoed the bill on the grounds that the language was unclear, that it did not provide for making funds available to satisfy judgments, that certain defenses might not be allowed, and that, despite the use of the words *"ex contractu,"* the language of the bill might also authorize some tort actions. The Governor requested that the matter be further studied. Veto Message of May 31, 1974, relating to House Bill 5, printed in Laws of Maryland 1974, pp. 3087-3089. After further study by a commission containing representatives of both the legislative and executive branches of government, and an interim report by the commission,[1] the Legislature in 1976 passed and the Governor signed a statute abrogating the State's immunity from suit in contract actions but not tort actions. Ch. 450 of the Acts of 1976.[2]

In Maryland, therefore, the immunity of the state government from suit was not a judicially fashioned doctrine. It was not a matter ignored by the Legislature. Instead, it was taken up by the General Assembly both at an early date and very recently. Just three years ago, the Legislature made a policy determination that the State's immunity should be abrogated in contract actions *only*. This Court should respect that policy determination. The immunity of the State from suit has consistently been a legislative matter in Maryland, and respect for a co-equal branch of government requires that it remain so.

## II.

With respect to the immunity from suit of the counties and municipalities of Maryland, however, the circumstances are entirely different. Since counties and municipalities are instrumentalities of the State, created by the State to carry on some of the State's governmental functions, logically there

---

1. Report Of The Governor's Commission To Study Sovereign Immunity (November 1976), p. iv.

2. The Act also provided that local governments could be sued for breaches of contract. However, since local governments in Maryland never did have immunity from suit in contract actions, American Structures v. City of Balto., 278 Md. 356, 359-360, 364 A.2d 55 (1976), and cases there set forth, this aspect of the 1976 statute did not reflect any policy change.

might seem to be little basis to distinguish them, for purposes of immunity from suit, from the State itself or other state agencies. Nevertheless, they have consistently been treated differently, and the immunity of the State has at no time been extended to the counties and municipalities of Maryland. Thus, counties and municipalities have never been given any degree of immunity from contract actions; instead, they have always been subject to suits for breach of contract. *American Structures v. City of Balto.*, 278 Md. 356, 359-360, 364 A.2d 55 (1976), and cases there cited. As to tort actions, throughout most of Maryland's history, counties and municipalities were generally held liable with respect to matters over which they had authority to control, either by statute or charter provision. *Mayor & C.C. of Balto. v. Marriott,* 9 Md. 160 (1856). *See also, e.g., M. & C.C. of Balt. v. Bassett,* 132 Md. 427, 429, 104 A. 39 (1918); *Taylor v. M. & C.C. of Balt.,* 130 Md. 133, 99 A. 900 (1917); *M. & C.C. of Hagerstown v. Crowl,* 128 Md. 556, 559, 97 A. 544 (1916); *Annapolis v. Stallings,* 125 Md. 343, 345-347, 93 A. 974 (1915); *City of Baltimore v. Merryman,* 86 Md. 584, 39 A. 98 (1898); *Hitchins Bros. v. Mayor, &c., of Frostburg,* 68 Md. 100, 11 A. 826 (1887); *Tyson v. Commissioners of Baltimore County,* 28 Md. 510 (1868); *Mayor & C.C. of Balto. v. Pendleton & Harlan,* 15 Md. 12 (1860). In more recent times, this Court has granted tort immunity to counties and municipalities with regard to those matters which the Court categorizes as "governmental" but not those activities which the Court labels "proprietary" or "corporate." *E.g., Bradshaw v. Prince George's County,* 284 Md. 294, 300, 396 A.2d 255 (1979); *Cox v. Anne Arundel County,* 181 Md. 428, 431, 31 A.2d 179 (1943); *Baltimore v. State,* 173 Md. 267, 272, 195 A. 571 (1937); *Gold v. Baltimore City,* 137 Md. 335, 112 A. 588 (1921).

Unlike the "sovereign immunity" of the State itself, the "governmental-proprietary" test for determining the tort liability of the subdivisions has, to the best of my knowledge, never been endorsed or generally dealt with by the Legislature. Instead, its beginnings and continuance have been entirely a matter of judicial decision. Consequently, the reasons for deferring to the Legislature regarding the

sovereign immunity of the State have no application to the governmental-proprietary standard for deciding local tort immunity.

Little space need be devoted to demonstrating the unsoundness of the governmental-proprietary distinction. It has been thoroughly done elsewhere. Although the majority opinion in the present case baldly asserts that the distinction was "developed over a period of years by decisions of this Court on a rational basis," the majority fails to explain or set forth any such rational basis. In fact, the opinions of this Court have regularly pointed to the unsatisfactory and illogical nature of the governmental-proprietary test. *E.g., E. Eyring Co. v. City of Baltimore,* 253 Md. 380, 382, 252 A.2d 824 (1969); *Cox v. Anne Arundel County, supra,* 181 Md. at 431, 433; *Baltimore v. State, supra,* 173 Md. at 272; *Baltimore v. State,* 168 Md. 619, 624-625, 179 A. 169 (1935); *Baltimore v. Eagers,* 167 Md. 128, 136, 173 A. 56 (1934). I can think of no reason whatsoever why the operation of a park, swimming pool or camp should be deemed "governmental," thereby relieving the City of liability for its negligence, whereas the construction and maintenance of public streets, bridges and sewers, or the removal of garbage, or the supplying of water to homes, should all be classified as "proprietary" with governmental liability for negligence. In light of the concern for the public health and the environment, the latter group of activities are just as important government functions as the former, if not more so. There simply is no rational basis for this classification of the operations of local government.

Virtually the only reason given in Maryland cases, including the majority opinion in this case, for the refusal to abandon or modify the governmental-proprietary test for determining the tort immunity of local governments, is the principal of stare decisis, or, as the Court put it in *Cox v. Anne Arundel County, supra,* 181 Md. at 433, "[i]n this State . . . the distinction has been adhered to too long for it now to be judicially altered." However, at the time the Court uttered those words in *Cox,* the governmental-proprietary distinction for deciding tort liability had been consistently adhered to for a relatively short time, only about twenty years. An historical

examination demonstrates that the governmental-proprietary test was adopted by this Court and regularly applied at a late date. As previously mentioned, throughout most of our history counties and municipalities were generally held liable in tort. The governmental-proprietary test for tort liability has no foundation in the reasoning of the earlier cases.

The first case in this Court dealing with the right to bring a tort action against a municipality or county, and the nature of the local government's liability, was apparently *Mayor & C.C. of Balto. v. Marriott, supra,* 9 Md. 160.[3] In that case, the plaintiff recovered damages from Baltimore City for an injury sustained because of the City's negligence in not removing an accumulation of ice from a sidewalk. The City, on appeal to this Court, argued for something like a governmental-proprietary distinction, contending "that the city is responsible, like an individual, in all cases where she acts as the *owner of property* . . ., and the cases cited on the other side are all cases of this character. But those are different cases from the present, where the city is *sovereign* within its limits . . . ." 9 Md. at 164. Baltimore City relied upon opinions in other states taking the position that no tort action could be maintained against a municipal corporation, such as *Riddle v. The Proprietors,* 7 Mass. 169, 187 (1810), as well as upon the leading English case holding that a county is immune from suit for damages occasioned by the county's failure to repair a bridge, *Russell v. The Men of Devon,* 2 D. & E. 667, 100 Eng.Rep. 359 (K.B. 1788). *See* 9 Md. at 164-165. The plaintiff, on the other hand, argued that a municipality was a corporation entitled to no portion of the State's sovereign immunity. *Id.* at 166-167. This Court, in affirming the judgment for the plaintiff, flatly rejected the City's arguments. The Court pointed out that the act incorporating Baltimore City gave the City authority *"to prevent and remove nuisances,"* and that, therefore, the corporation of Baltimore was "upon the same footing which is held by individuals and private corporations." *Id.* at 174. The Court

---

3. Although there were tort suits against local governments prior to *Marriott, e.g.,* Mayor and C.C. of Balto. v. Norman, 4 Md. 352 (1853), evidently no issue was raised concerning the immunity of local governments until *Marriott.*

held that the only difference between the City and a private individual, insofar as tort liability, was that the City's duty was based upon statute whereas the common law placed duties upon individuals, but that the consequences for breach of duty were the same. *Id.* at 174-175. There is no suggestion in *Marriott* of a governmental-proprietary test for deciding local government tort liability; instead, this Court's reasoning in that case would be just as applicable to activities later deemed "governmental."

A few years later, the principles set forth in *Marriott* were recognized in the context of a defective condition at a city market, *Mayor & C.C. of Balto. v. Brannon,* 14 Md. 227 (1859), although the Court found no liability on the facts of the case. The following year, in *Mayor & C.C. of Balto. v. Pendleton & Harlan,* 15 Md. 12 (1860), the *Marriott* holding was applied to the activity of leaving an open trench, for water pipes, to remain across the street, despite the City's argument, based on out-of-state cases, that it was immune from suit because the function was "of a municipal or political character," 15 Md. at 14. In *Co. Comm's of A. A. Co. v. Duckett,* 20 Md. 468, 477 (1864), the Court, relying on *Marriott,* held Anne Arundel County liable for the death of the plaintiff's horse caused by the county's negligence in failing to repair a road. The Court in that case expressly held that the leading English governmental immunity case, *Russell v. The Men of Devon, supra,* was inapplicable to counties in this State, 20 Md. at 479-480.

During the remainder of the nineteenth century and the early years of the twentieth century, the principles of the *Marriott* case were regularly applied to hold counties and municipalities liable in tort in a wide variety of situations. Thus, in *Havre De Grace v. Fletcher,* 112 Md. 562, 570, 77 A. 114 (1910), the Court observed, relying on *Marriott,* that "[t]here is no difference between the liability of a municipal corporation with such a charter as the defendant has, and that of an individual." And in *Bembe v. Anne Arundel County,* 94 Md. 321, 329, 51 A. 179 (1902), the Court stated that "municipal corporations have no more right to create or maintain a public nuisance than a private individual has. . . ."

And the liability of the one, in such an instance, is similar to that of the other." *See also, e.g., Annapolis v. Stallings, supra,* 125 Md. at 345-346; *Richardson v. Co. Comm'rs. Kent Co.,* 120 Md. 153, 87 A. 747 (1913); *Kurrle v. Baltimore City,* 113 Md. 63, 77 A. 373 (1910); *Thillman v. Baltimore City,* 111 Md. 131, 73 A. 722 (1909); *Baltimore City v. Walker,* 98 Md. 637, 57 A. 4 (1904); *Baltimore City v. Beck,* 96 Md. 183, 53 A. 976 (1903); *Keen v. Havre De Grace,* 93 Md. 34, 48 A. 444 (1901); *Hagerstown v. Klotz,* 93 Md. 437, 49 A. 836 (1901); *Guest v. Church Hill,* 90 Md. 689, 45 A. 882 (1900); *City of Baltimore v. Merryman, supra,* 86 Md. 584; *Cochrane v. Frostburg,* 81 Md. 54, 31 A. 703 (1895); *Kranz v. Mayor, &c., of Baltimore,* 64 Md. 491, 2 A. 908 (1886); *Taylor v. Mayor, &c., of Cumberland,* 64 Md. 68, 20 A. 1027 (1885); *County Commissioners of Prince George's Co. v. Burgess,* 61 Md. 29 (1883); *Eyler v. County Comm'rs of Allegany County,* 49 Md. 257 (1878); *County Comm'rs of Balto. County v. Baker,* 44 Md. 1 (1876); *County Com'rs of Calvert Co. v. Gibson,* 36 Md. 229 (1872). In none of these cases, and in none of the many similar cases during this period of which I am aware, was there any mention in the language of this Court of the governmental-proprietary test for determining immunity from tort suit.[4]

Of course, during this same period, tort liability was not imposed upon local governments in some situations. However, these holdings were not grounded upon a governmental-proprietary distinction; they were based upon entirely different considerations. For example, the City of Baltimore was held not to be liable for the negligence or breach of duty of Baltimore City policemen. These decisions were not based upon any theory that police activity was "governmental." Rather, they were based upon the nature of the Baltimore City Police Department, being a state agency, with the City having no control over it. *Taxicab Co. v. M. & C.C. of Baltimore,* 118 Md. 359, 370, 84 A. 548 (1912); *Sinclair v. Mayor, &c. of Baltimore,* 59 Md. 592 (1883); *Altvater v. The*

---

4. In *Duckett,* 20 Md. at 476, there is language in a quotation from another source which might suggest a governmental-proprietary standard. However, nothing said by this Court itself suggests any such test. Rather, this Court broadly defined the tort liability of local governments, *id.* at 477.

*Mayor and City Council of Baltimore,* 31 Md. 462 (1869). Similarly, in a situation where the control over roads was taken from the county commissioners, liability was not imposed upon the commissioners for injuries caused by defective roads, *Baltimore County v. Wilson,* 97 Md. 207, 54 A. 71 (1903). Local school boards were held immune from tort suit in *Weddle v. School Commissioners,* 94 Md. 334, 343-345, 51 A. 289 (1902), on grounds having nothing to do with the governmental-proprietary distinction.[5]

Significantly, the language of the early cases suggested the more logical distinction between discretionary or policy-making determinations on the one hand, for which local governments could not be sued, and the carrying out of governmental activities on the other hand, which, if not done with ordinary care, did result in liability for injuries. As explained in *Mayor and Councilmen of Frostburg v. Hitchins Bros.,* 70 Md. 56, 66-67, 16 A. 380 (1889):

> "The power under its charter to grade streets and build culverts and sewers, is a *discretionary* power, to be exercised by the city authorities whenever in their judgment the public good required it. For the non-exercise of such a power no action it is true will lie, but if they undertake to build a culvert or sewer for the purpose of carrying off the surface water and drainage, they are bound to exercise reasonable care in the execution of the work. And if by reason of the negligent construction of a sewer, the drainage instead of being able to flow through it, dams up at its mouth, and is discharged with destructive force upon the property of an adjacent owner, the corporation is answerable for the injury. It has no more right than an individual to collect surface water from its street into an artificial channel, and discharge it upon the property of another; nor has it any right to create or maintain a nuisance."

*See also Hitchins Bros. v. Mayor, &c., of Frostburg, supra,*

---

5. *Compare* the opinion several years later in Gold v. Baltimore City, 137 Md. 335, 337, 112 A. 588 (1921), relying largely on out-of-state sources, and basing this immunity upon the governmental-proprietary test.

68 Md. at 109-110; *Walter v. County Commissioners of Wicomico Co.,* 35 Md. 385, 394 (1872); *Tyson v. Commissioners of Baltimore County, supra,* 28 Md. at 527-528.

The first application of the governmental-proprietary test for local government tort liability by this Court, as far as I am aware, was in 1914, *Wallace v. M. & C.C. of Baltimore,* 123 Md. 638, 91 A. 687 (1914), with the Court relying entirely upon authority from other states and failing to cite a single earlier Maryland case. The test was next mentioned as a second alternate ground of decision in *Gutowski v. M. & C.C. of Balto.,* 127 Md. 502, 507, 96 A. 630 (1916). However, the Court in *Gutowski* acknowledged that the test for local government tort liability applied in earlier Maryland opinions was "broad enough to include municipal duties generally, without reference to the distinction as to their corporate or governmental character." 127 Md. at 508.[6] The governmental-proprietary distinction was dealt with in a few other cases between 1916 and 1930.[7] Nevertheless, even during this period, the great majority of this Court's opinions involving tort suits against local governments made no mention of the governmental-proprietary distinction but applied the principles of *Marriott* and the other earlier cases.[8] It was not until the 1930's that this Court regularly began to apply the governmental-proprietary test for local government

---

6. The Court in *Gutowski* went on to state that in all of the earlier cases, the activity involved was in fact "proprietary," 127 Md. at 508. This statement is accurate only if one defines "proprietary" as those activities involved in all of the suits against local governments prior to 1914. It is noteworthy that just a year earlier, in State v. Rich, 126 Md. 643, 645, 95 A. 956 (1915), the Court characterized the establishment and maintenance of highways as "the exercise of an important public function" which was "essentially a duty and prerogative of government."

7. *E.g.,* Gold v. Baltimore City, 137 Md. 335, 112 A. 588 (1921); Apartment House Co. v. Baltimore, 131 Md. 523, 102 A. 920 (1917).

8. *E.g.,* Baltimore v. Poe, 161 Md. 334, 156 A. 888 (1931); County Commissioners v. Collins, 158 Md. 335, 148 A. 242 (1930); Kent County v. Pardee, 151 Md. 68, 134 A. 33 (1926); Wash., B. & A. R. Co. v. Cross, 142 Md. 500, 121 A. 374 (1923); Charles v. Baltimore, 138 Md. 523, 114 A. 565 (1921); Vannort v. Commrs. of Chestertown, 132 Md. 685, 104 A. 113 (1918); M. & C.C. of Balt. v. Bassett, 132 Md. 427, 104 A. 39 (1918); Taylor v. M. & C.C. of Balt., 130 Md. 133, 99 A. 900 (1917); Biggs v. M. & C.C. of Balt., 129 Md. 686, 99 A. 860 (1917); M. & C.C. of Hagerstown v. Crowl, 128 Md. 556, 97 A. 544 (1916); Annapolis v. Stallings, 125 Md. 343, 93 A. 974 (1915).

tort liability, often attempting to reinterpret the earlier cases in light of that test.[9]

In sum, the governmental-proprietary test for municipal and county tort liability is not only arbitrary, but it has not been embedded in the law of this State for a long period of time. Thus, to say that it "has been adhered to too long for it now to be judicially altered," *Cox v. Anne Arundel County, supra,* 181 Md. at 433, is not valid.

Last month in *Lewis v. State, supra,* this Court took the position that the principle of criminal law, that an accessory could not be tried until the principal was convicted, was today unsound, despite the consistent adherence to that principle from the year 1276 until the present. We therefore abrogated a rule which the courts had followed for hundreds of years. Certainly we can likewise abrogate a judicially created standard for local government tort liability that courts in this State have adhered to for a relatively brief period if we are similarly convinced, as I am, that it is also unsound.

Judge Smith has authorized me to state that he concurs with the views expressed in Part I herein.

*Cole, J. dissenting:*

A five year old child drowned due to the admitted negligence of agents of the City of Baltimore and the majority holds today that the mother may not recover because the City is immune from liability and may not be held accountable for the tortious conduct of its employees. If a private party had been the wrongdoer, the mother could have recovered. The majority ignores this distinction and continues to perpetuate the gross inequity inherent in the doctrine of governmental immunity, that liability may turn merely on the identity of the wrongdoer. I find this concept wholly unacceptable as being unjust, unsupported by any valid reason and having no place in today's society. I, therefore, respectfully dissent.

It is my firm belief that this Court should meet its

---

9. *E.g.,* Harford County v. Love, 173 Md. 429, 196 A. 122 (1938); Baltimore v. State, 173 Md. 267, 195 A. 571 (1937); Baltimore v. State, 168 Md. 619, 179 A. 169 (1935); Baltimore v. Eagers, 167 Md. 128, 173 A. 56 (1934); Wynkoop v. Hagerstown, 159 Md. 194, 150 A. 447 (1930).

responsibility head on and thoroughly reexamine the viability of the judicially created doctrine of governmental immunity and thereby reach the inescapable conclusion that the doctrine should be rejected and Maryland should follow the rule that liability follows tortious conduct. In so doing, we would bring ourselves in step with the majority of our sister states, which have limited or completely curtailed the use of governmental immunity as a defense to tort actions.[1] I fully appreciate the soundness of following the rule of stare decisis to promote stability in the law; however, stare decisis should not mean blind adherence to the past with no regard to the impact of the law on the present.

---

1. As of the date of this writing, I note that courts in thirty jurisdictions have abrogated the doctrine of sovereign immunity in whole or in part. *See* Jackson v. City of Florence, 294 Ala. 592, 320 So. 2d 68 (1975); Scheele v. City of Anchorage, 385 P.2d 582 (Alaska 1963); Stone v. Arizona Highway Commission, 93 Ariz. 384, 381 P.2d 107 (1963); Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45 (1968); Muskopf v. Corning Hospital District, 55 Cal. 2d 211, 359 P.2d 457, 11 Cal. Rptr. 89 (1961); Evans v. Board of County Com'rs of County of El Paso, 174 Colo. 97, 482 P.2d 968 (1971); Spencer v. General Hospital of District of Columbia, 425 F.2d 479 (D.C. Cir. 1969); Hargrove v. Town of Cocoa Beach, 96 So. 2d 130 (Fla. 1957); Smith v. State, 93 Idaho 795, 473 P.2d 937 (1970); Molitor v. Kaneland Community Unit District No. 302, 18 Ill. 2d 11, 163 N.E.2d 89 (1959), *cert. denied,* 362 U.S. 968, 80 S. Ct. 955, 4 L. Ed. 2d 900 (1960); Campbell v. State, 259 Ind. 55, 284 N.E.2d 733 (1972); Brinkman v. City of Indianapolis, 141 Ind. App. 662, 231 N.E.2d 169 (1967); Carroll v. Kittle, 203 Kan. 841, 457 P.2d 21 (1969); Haney v. City of Lexington, 386 S.W.2d 738 (Ky. 1964); Hamilton v. City of Shreveport, 247 La. 784, 174 So. 2d 529 (1965); Davies v. City of Bath, 364 A.2d 1269 (Me. 1976); Pittman v. City of Taylor, 398 Mich. 41, 247 N.W.2d 512 (1976); Williams v. City of Detroit, 364 Mich. 231, 111 N.W.2d 1 (1961); Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795 (1962); Jones v. State Highway Commission, 557 S.W.2d 225 (Mo. 1977); Brown v. City of Omaha, 183 Neb. 430, 160 N.W.2d 805 (1968); Rice v. Clark County, 79 Nev. 253, 382 P.2d 605 (1963); Merrill v. City of Manchester, 114 N.H. 722, 332 A.2d 378 (1974); Willis v. Department of Conservation & Econ. Dev., 55 N.J. 534, 264 A.2d 34 (1970); Hicks v. State, 88 N.M. 588, 544 P.2d 1153 (1975); Bernardine v. City of New York, 294 N.Y. 361, 62 N.E.2d 604 (1945); Kitto v. Minot Park District, 224 N.W.2d 795 (N.D. 1974); Mayle v. Pennsylvania Dept. of Highways, 479 Pa. 384, 388 A.2d 709 (1978); Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973); Becker v. Beaudoin, 106 R.I. 562, 261 A.2d 896 (1970); Long v. City of Wierton, 214 S.E.2d 832 (W. Va. 1975); Holytz v. City of Milwaukee, 17 Wis. 2d 26, 115 N.W.2d 618 (1962); Oroz v. Board of County Com'rs of Carbon County, 575 P.2d 1155 (Wyo. 1978). I should also call attention to the large number of distinguished legal scholars who have consistently criticized the doctrine *E.g.,* 3 K. Davis, *Administrative Law Treatise,* §§ 25.00, 25.01 (1958, 1970 & 1976 Supps.); 2 F. Harper & F. James, *The Law of Torts,* §§ 29.1-29.10 (1956); Borchard, *Governmental Responsibility in Tort,* 36 Yale L.J. 1039 (1927); Borchard, *Governmental Liability in Tort,* 34 Yale L.J. 1 (1924); Fuller & Casner, *Municipal Tort Liability in Operation,* 54 Harv. L. Rev. 437 (1941); Green, *Freedom of Litigation (III) Municipal Liability for Torts,* 38 U. Ill. L. Rev. 355 (1944).

The doctrine of governmental immunity, in its present form, is hardly similar to the original common law principle which exempted the sovereign from liability in court on the theory that the "king could do no wrong." It was introduced in this country on the premise that the new government was not financially secure so as to satisfy claims of negligence stemming from governmental activities. The earliest decisions of this Court trace the doctrine of governmental immunity back to *Russell v. The Men of Devon,* 100 Eng. Rep. 359 (1788) and state that "[t]his immunity belongs to the State by reason of her prerogative as a sovereign, and on grounds of public policy." *See State v. B. & O. R.R. Co.,* 34 Md. 344, 374 (1871); *Co. Comms. v. Duckett,* 20 Md. 468, 479 (1864). Since that time, for over one hundred years, and despite the growth of and changes in tort law and in the nature of state and local government and without any articulation of the underlying reasons for the rule other than general and terse references to "fiscal considerations," "administrative difficulties," and "other problems," *e.g., Board v. John K. Ruff Inc.,* 278 Md. 580, 366 A.2d 360 (1976); *Spriggs v. Levitt & Sons, Inc.,* 267 Md. 679, 298 A.2d 442 (1973); *Jekofsky v. State Roads Comm'n.,* 264 Md. 471, 287 A.2d 40 (1972), this Court has unquestioningly adhered to this doctrine and thus insulated itself from the magnitude of the wrong being wrought by its application. The Court's recent rationale for failing to reexamine the merits of governmental immunity is that the doctrine is now so firmly entrenched in the law of this State that this Court can no longer alter it; it remains for the Legislature to grant relief. *See, e.g., Katz v. Wash. Suburban Sanitary Com'n,* 284 Md. 503, 397 A.2d 1027 (1979); *Quecedo v. Montgomery County,* 264 Md. 590, 287 A.2d 257 (1972); *Robinson v. Bd. of County Comm'rs.,* 262 Md. 342, 278 A.2d 71 (1971); *Duncan v. Koustenis,* 260 Md. 98, 271 A.2d 547 (1970).

This rigid view of the rule of stare decisis simply cannot be reconciled with what I glean to be a primary concern of the judiciary: to protect the individual against unjust governmental activity. Nor can it be squared with our prior decisions. Heretofore, when an issue concerning the

evolution of a common law doctrine was presented on "all fours," as in the present case, we have not hesitated to "take the bull by the horns" and resolve the matter. *Compare McGarvey v. McGarvey*, 286 Md. 19, 405 A.2d 250 (1979); *Lewis v. State*, 285 Md. 705, 404 A.2d 1073 (1979); *Pope v. State*, 284 Md. 309, 396 A.2d 1054 (1979); *Lusby v. Lusby*, 283 Md. 334, 390 A.2d 77 (1978); *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977); *Davis v. Davis*, 280 Md. 119, 372 A.2d 231, cert. denied, 434 U.S. 939, 98 S. Ct. 430, 54 L. Ed. 2d 299 (1977); *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976); *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 349 A.2d 245 (1975). We said in *Pope v. State, supra*, 284 Md. at 341-42 that the common law "may be changed by legislative act as Art. 5 of the Declaration of Rights expressly provides . . . . It may also be changed by judicial decisions." Thus, the determination of whether the common law is suitable in today's society was never intended to be a matter resolvable by the Legislature alone.[2] *See also State v. Brown,* 21 Md. App. 91, 318 A.2d 257 (1974); *Latz v. Latz a/k/a Schafer,* 10 Md. App. 720, 272 A.2d 435 (1971) (written by Judge Orth now of this Court in his former capacity as Chief Judge of the Court of Special Appeals). It seems to me that the majority today contradicts its prior pronouncements.

Nor is there a valid reason why this Court should not consider public policy factors in seeking to determine whether governmental immunity is a viable doctrine. While it is likely that fiscal and administrative problems will be incidental to

---

2. The Maryland General Assembly has only sporadically dealt with the question of governmental immunity. In 1786 the legislature abolished the doctrine. See Chapter 53 of the Laws of Maryland (1786). Thirty-four years later, however, the doctrine was reinstated. See Chapter 210 of the Laws of Maryland (1820). The next legislative action came over 150 years later, in 1976, when governmental immunity in contract was abolished, *see* Chapter 450 of the Laws of Maryland (1976), and charter counties were given the power to waive their immunity to suit in tort actions. *See* Chapter 825 of the Laws of Maryland (1976). Despite the fact that no less than eight bills addressing the problem of sovereign immunity were introduced in the 1979 session of the General Assembly, as of May 1, 1979 no comprehensive legislation abrogating sovereign immunity to tort actions had been passed. *See* O'Meally, *Sovereign Immunity is Archaic But Still Exists in Local Laws,* The Daily Record, May 1, 1979, at 14, Col. 1.

the abolishment of governmental immunity, these factors should not be allowed to become roadblocks to this Court's meeting its responsibility. The Supreme Court of Indiana in *Campbell v. State,* 259 Ind. 55, 284 N.E.2d 733, 736-737 (1972) summarized this proposition as follows

> The state argues that abolition of sovereign immunity will result in a great number of problems for the state. Inability to collect payment for claims against the state, inability of the state to secure adequate insurance, and prospective legal chaos are cited as examples of some of these problems. The arguments which the state presents are questions which properly belong to the legislature in facing and solving the problems of liability. Such arguments do not apply to the doctrine in its present state. We are only concerned with the common law justification of the doctrine. . . .

> \* \* \*

> The proper forum for such argument is in the legislature on the topic. *The existence and application of the doctrine of sovereign immunity is a judicial question.* [emphasis supplied].

The majority has offered no empirical support for its generalized assertions that tort claims would have a crippling effect on state and local governments. I find, as have other courts, that arguments based on such purely speculative fears are without merit. *E.g., Parish v. Pitts,* 244 Ark. 1239, 429 S.W.2d 45 (1968); *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973). Studies of the effect of tort liability on governments have, on the contrary, demonstrated that prophesies of financial disaster are groundless. *See generally,* Fuller & Casner, *Municipal Tort Liability in Operation,* 54 Harv. L. Rev. 437 (1941).

I recognize that abrogation of the doctrine may impose some burden on government. However, as the Supreme Court of Arkansas reasoned in *Parish v. Pitts, supra,* 429 S.W.2d at 50: "No one has ever suggested that it will not add to the

financial problems of the municipalities. Anything short of financial disaster, however, is insufficient reason for exempting the cities from the rule of tort liability." As the law now stands in Maryland, the injured citizen must bear all the harm thrust upon him by a negligent government. This is manifestly unjust and inequitable in light of contemporary concepts of cost spreading and the general rule that liability follows tortious conduct. Any additional expense due to tort claims should be treated as any other cost of administration and spread among the public.

## II

I believe the Court should have used this case as a vehicle to repudiate the court-created distinction between governmental and proprietary activities. This Court has held that if a governmental body is negligent in carrying out a proprietary function, it will be liable for its negligence; if its activity is regarded as governmental, the shield of governmental immunity will protect it from suit. What constitutes a proprietary activity as opposed to a governmental activity has never been clearly defined. However, the fact that the doctrine is beyond the scope of clear interpretation has not prevented its application. As Professor Davis has noted, "[t]he distinction is probably one of the most unsatisfactory known to the law, for it has caused confusion not only among the various jurisdictions but almost always within each jurisdiction." 3 K. Davis, *Administrative Law Treatise,* § 25.07, at 460 (1958).

Maryland provides a case in point.[3] In the reported decisions of this State one finds the following examples of illogic and absurdity. Recovery is denied to an individual injured while in a public park for recreational purposes, *Baltimore v. State, ex rel. Blueford,* 173 Md. 267, 195 A. 571 (1937); *Baltimore v. State, ex rel. Ahrens,* 168 Md. 619, 179 A. 169 (1935), but is permitted as to a pedestrian who falls on steps located within a public park, or who is struck by the

---

**3.** *See also* the comprehensive discussion in Clarke, *Municipal Responsibility in Tort in Maryland,* 3 Md. L. Rev. 159 (1939).

falling limb of a tree in a public park. *Haley v. City of Baltimore,* 211 Md. 269, 127 A.2d 371 (1956); *Baltimore v. Eagers,* 167 Md. 128, 173 A. 56 (1934). Maintenance of a park has been held to be governmental, *Blueford* and *Ahrens, supra,* while maintenance of public roads has been held to be proprietary. *Cox v. Anne Arundel County,* 181 Md. 428, 31 A.2d 179 (1943). Maintenance of a court house has been held to be governmental, but removal of ashes and refuse from an apartment house is proprietary. *Compare Harford County v. Love,* 173 Md. 429, 196 A. 122 (1938) *with Apartment House Co. v. Baltimore,* 131 Md. 523, 102 A. 920 (1917).

The majority today concedes that the line between governmental and proprietary functions is often difficult to define and is sometimes illusory in practice. *See also E. Eyring Co. v. City of Baltimore,* 253 Md. 380, 252 A.2d 824 (1969). Nevertheless, the majority does not advance any reasons in support of its continued adherence to the *Blueford* test beyond stare decisis and a bald statement that the test is "rational" and is "consistent with sound public policy."

As I see it, the retention of the *Blueford* test represents a further perpetuation of unsound policy in Maryland tort law. The criteria of public benefit and profit are unsatisfactory, as Professors Harper and James have demonstrated:

> All the functions of a municipality are — or should be — for the public benefit. They are none the less so because they serve directly and primarily only a limited segment of the public rather than all the people of the state. To the extent that cities are instrumentalities of the state, their main function is to serve the state's purposes locally . . . . The fact that the municipality makes a charge or profit has often been considered; . . . but functions have been held governmental in spite of a charge . . . *[e.g., Blueford, supra]* . . ., and functions have been held proprietary where there is neither charge nor profit . . . *[e.g., Haley, supra]*. . . . [2 F. Harper & F. James, *The Law of Torts,* § 29.6, at 1622 (1958) (footnotes omitted)].

It seems incongruous to let recovery for injuries occasioned by governmental negligence rest upon the chance that a particular activity creates a profit or upon this Court's inconsistent application of such factors. It is unreasonable to allow compensation to hinge upon whether a particular government employee has enough personal funds to pay a tort judgment for actions occurring within the scope of his employment. The better policy is to recognize that government today is big business and should be prepared to spread this cost as it would any other.

My colleagues continue to hold to the doctrine of governmental immunity and the exceptions thereto on the theory that the rule of stare decisis requires them to. I disagree because I believe that when reason for the precedent no longer exists, abrogation of the precedent is not destructive of stare decisis but the fulfillment of its proper purpose.

For these reasons, I most respectfully dissent.